# Richmond

CITY OF NEWPORT NEWS, ET AL. v. DAVID HERTZLER, ET AL.

January 16, 1976.

Record No. 750159.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Lawrence Mark Spigel,* for appellants.

*Richard W. Hudgins* (*Hudgins & Neale,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the court.

This appeal presents the question whether the final decree entered by the trial court on December 11, 1974, enjoining the City of Newport News and the members of its City Council from operating a public park, is contrary to the law and the evidence.

In September, 1972, the City acquired 13 acres of land at the end of Denbigh Boulevard, within the corporate limits, for the purpose

of establishing and maintaining thereon for the benefit of its citizens a public park, known as Denbigh Boulevard Park, including a parking lot, nature trails, bridges, an overlook, a fishing pier, a boat house, and a boat ramp to provide access to the Warwick River. Funded by Federal, State and City moneys, the project cost approximately $139,000.

On July 9, 1974, David Hertzler and 31 other complainants filed their bill of complaint in the trial court against the City and the members of its City Council, alleging that the City, in its operation of the Park, was maintaining a nuisance. The bill, which described the complainants as owners of real property at or near the Park, alleged that the City had opened the Park when it was uncompleted, unregulated and unsupervised. Specifically, complainants alleged erosion of the shore by speeding boats launched from the Park ramp; a health hazard caused by debris, human excrement and stench; annoyance from noisy parties, lack of toilets, lights, trash receptacles, and telephones; and lack of supervision of Park facilities. Complainants alleged that these conditions constituted a present danger to the health and welfare of the adjacent landowners, which, if permitted to continue, would cause them irreparable damage. They sought an injunction prohibiting the City from operating the Park until it had been completed, with regulations posted, sanitary facilities and lights installed, a buffer zone established, and adequate supervision and policing provided. They also gave notice of their intention to seek a temporary restraining order.

After a hearing on July 10, 1974, the trial court deferred action on complainants' application for a temporary restraining order, but ordered the City to show cause, at a hearing set for August 1, 1974, why the Park should not be closed. At this second hearing, the court overruled the Special Plea filed by the members of City Council that they were not proper parties to the proceeding, and heard the evidence. The court twice viewed the Park and, on August 5, 1974, over objection, ordered the City to file a "letter of intent" as to installation of permanent sanitary facilities and establishment of a plan for law enforcement at the Park. A letter of intent was filed by the City but was not considered as evidence in the trial court and was not made a part of the record. On September 3, 1974, the court entered an order stating that the City "has established two portable toilets on the property and . . . has not properly supervised and policed" the Park. On September 24, 1974, the court ruled that the complainants were entitled to injunctive relief. The final decree of

December 11, 1974, awarded complainants a permanent injunction, but stayed the effect of the decree, pending this appeal by the City and the members of its City Council.

In both evidentiary hearings complainants relied almost entirely upon the testimony of complainant David Hertzler. Hertzler lived with his family in one of two residences which he owned on Denbigh Boulevard, across from the Park. At the time of the first hearing that portion of Denbigh Boulevard lying between the Hertzler properties and the Park had not been hard-surfaced, but the public, nevertheless, had been permitted to use this access road, and dust from the increased vehicular traffic was annoying to the Hertzlers. Hertzler testified that trash and debris accumulated in the unfinished parking lot at the Park and overflowed onto property of adjacent landowners; that the Park had no supervision and no posted closing time, so that noisy drinking parties and the racing of motor vehicles on the parking lot disturbed the Hertzlers at night; and that because the Park lacked such facilities as lights, water fountains, toilets, and telephones, the Hertzlers were annoyed by requests from Park visitors for water and the use of a telephone.

Hertzler enumerated ten complaints that he had made to various public officials from June 4 through June 21, 1974. Hertzler also testified that on occasions he had observed human excrement in the Park, and that the area smelled of human waste. Hertzler had observed a boy urinating into the water from the boat house, and he introduced into evidence a photograph showing a man urinating from a lookout on a back trail of the Park.

At this hearing the only other witness who testified for complainants was complainant Vernon S. Briggs, who also resided on Denbigh Boulevard. Briggs expressed concern that the westerly end of Denbigh Boulevard had not been completed, that there had been a tremendous increase in vehicular traffic, and that the Park area was unsupervised. He admitted, however, that he did not live within view of the Park, that he had never seen or smelled the odor of human waste in the area, and that he had not observed therein any disorderly behavior or the consumption of alcoholic beverages.

Ronald Burroughs, Director of Parks and Recreation of the City, was the only witness called by the defendants. Burroughs conceded that the Park had been opened before the facilities had been completed. Because of a gravel shortage the City had been delayed in completing the parking lot, which had postponed the hard-surfacing of the westerly end of Denbigh Boulevard by the State Highway

Department. Burroughs testified that he had discussed Hertzler's complaints with Hertzler on numerous occasions, and would attempt to comply with all requests made by the complainants. Trash cans, already ordered, would be placed in the Park as soon as they were delivered; a buffer zone of trees would be planted to shield the parking lot from Hertzler's view; and "no parking" signs would be erected along the westerly end of Denbigh Boulevard. Signs had been posted to prohibit swimming and diving from the pier and the boat ramp. To provide supervision of the facilities, park rangers and police and juvenile officers would patrol at intervals.

Burroughs was of opinion, based upon his regular observations of the area, that permanent toilet facilities were not needed. He further testified that the marshy terrain would not permit the use of septic tanks, and that use of a sewer line would necessitate installation of a pump and a feeder line at prohibitive expense to the City. He also expressed concern that any sanitary facilities would be vandalized.

Hertzler testified at the August 1, 1974 hearing, that the noisy parties at night and other activities in the Park continued to annoy him and his family. The City had not placed "no wake" signs in the water, and the river traffic was still a problem. The parking lot had not been completed. Trash receptacles had been placed, but not in the most convenient locations, resulting in the continued accumulation of debris and litter. Two unsightly, temporary toilets, known as "porta-toilets" whose doors faced the Hertzler residence, had been placed on the parking lot within plain view of the Hertzlers. Vandals had defaced these sanitary units with painted inscriptions.

Hertzler, over defendants' objections, introduced into evidence numerous photographs which he had taken on various dates from June 5 through August 1, 1974. Several of the photographs, taken before trash receptacles had been placed in the Park, showed a few discarded beer bottles and cans. Of other pictures taken prior to the first hearing, two showed youngsters on the boat house roof, one showed a boy urinating from the pier, one showed horses in the boat ramp area, one showed a boat speeding on the river, and another showed a boat trailer blocking a driveway. Photographs taken of the parking lot after the first hearing showed the two "porta-toilets", water in a ditch at the edge of the entrance to the lot, two cars and two boat trailers parked on the lot, a van stuck in the gravel surface, and road grading equipment standing near piles of gravel.

Hertzler conceded that Denbigh Boulevard had been made passable; that speed limit and "no parking" signs had been posted on the

street; that some debris had been removed; that a "no swimming" sign had been placed on the boat house; and that two signs had been installed to warn the public that the nature trails in the Park were closed at sundown. He contended, however, that the buffer strip, one shrub in depth, was inadequate, that loud parties and noisy movement of vehicles late at night continued, and that the Park still lacked telephone and drinking water facilities.

The other witness for the complainants at this hearing was Police Officer Mark Muza, who served on one of the City's two Police Boats. He testified that there were no posted regulations or "no wake" signs to control water traffic at the Park, that the access road and parking lot were incomplete, and that the large numbers of vehicles and boats, and the unsupervised fishing pier and building caused "considerable congestion" and a hazardous condition. Muza admitted, however, that the unsafe boating incidents which he had observed were not serious enough to justify arresting the offenders, and that he had never seen or smelled any human waste in the Park area.

Burroughs, called again as a witness for the defendants, testified that the parking lot, although not yet fully completed, had been gravelled since the first hearing. The westerly end of Denbigh Boulevard leading into the Park area had been completed, and "no parking" and "25 miles per hour" signs had been posted on the street in the vicinity of the Park. He had ascertained that no residents of Denbigh Boulevard in the area of the Park objected to the lighting plan submitted to the City by the electric utility serving the neighborhood. Signs had been erected to notify the public that the nature trails closed at sundown. Burroughs, who regularly visited the Park, had never observed or smelled human waste. Burroughs also testified that ranger patrols had been increased, that the criminal laws were being enforced in the Park by the rangers and police officers of the City, and that misconduct at the Park involved only isolated incidents similar to those that occurred throughout the City.

John Tekinder, Park Supervisor for the City's Recreation and Parks Department, another witness for the defendants, introduced into evidence the log entries made by rangers under his supervision to show the number and results of their patrols of the Park. These entries indicated that during each period of twenty-four hours, from three to seven patrols were made by two-ranger teams, and that no disorderly activity was observed. Tekinder admitted that the rangers

did not arrest people for drinking in public in the Park and attempted to control only "blatant and obvious situations".

Fred Mirick, Superintendent of Public Relations for the City, introduced photographs showing the Park facilities and the routine and orderly use of the facilities by the public.

In rendering its decision on September 24, 1974, that the City was maintaining a nuisance in its operation of the Park, the trial court acknowledged the right of the City to establish the Park, and eliminated as grounds for injunctive relief evidence of increased land and water traffic, erosion of the shore, speed of boats, and lack of water fountains and telephones. Nevertheless, the court found "that there overflows from this Park an unreasonable encroachment upon the use and enjoyment of the people in the surrounding area", and particularly the Hertzler family. The court stressed the evidence of drinking in cars and "throwing" of tin cans and bottles in the parking lot; the urinating in public within sight of the Hertzlers, and the evidence of human excrement; the inadequate buffer screen of bushes; and the installation of two "unsightly" portable toilets with doors facing the Hertzler residence.

Subsequently, at a hearing in which the wording of the injunctive order was argued, the trial court alluded to the "parking lot racing" as evidence of inadequate police patrolling in the Park. The court observed that the City, disregarding the objections of nearby residents, had opened the Park before the facility was ready for operation. The court further observed that the City should build sanitary facilities and keep them clean, should beautify the parking lot, and should maintain sufficient police patrols to prevent annoyance to neighbors at night from noisy conduct by Park visitors. The final decree, however, merely recited that the court had made a finding of fact that the City was operating the Park "in such manner as to constitute a nuisance, and further in such a manner as to unreasonably interfere in the use and enjoyment of property owned by the Complainants . . . ."

■ We have held that the "term 'nuisance' embraces everything that endangers life or health, or obstructs the reasonable and comfortable use of property". *Barnes* v. *Quarries, Inc.*, 204 Va. 414, 417, 132 S.E.2d 395, 397 (1963). Stated another way, a private nuisance is an activity which unreasonably interferes with the use and enjoyment of another's property. *See* Prosser, Torts § 89, p. 591, *et seq.* (4th ed. 1971). We have also held that a municipal corporation has no immunity from creating or maintaining a nuisance, where the

act complained of is not authorized by law. *Portsmouth* v. *Weiss*, 145 Va. 94, 109, 133 S.E. 781, 786 (1926). Moreover, the granting or denial of injunctive relief is largely a matter within the discretion of the chancellor, who has seen and heard the witnesses, and whose findings of fact will not be disturbed by us unless plainly wrong or without evidence to support them. *McCauley* v. *Phillips*, 216 Va. 450, 219 S.E.2d 854 (1975). Nevertheless, in the present case we hold that the award of injunctive relief was based upon a finding of fact without evidence to support it, and must be reversed.

There was evidence that Hertzler had observed human excrement in the Park on several occasions and that several times he had seen a male urinating. This is not sufficient, however, to show that sanitary facilities were needed or that, if installed, they would be used. The City's evidence was that such facilities were not needed, but that two "porta-toilet" units had been installed and, as anticipated, had been promptly defaced by vandals.

Hertzler objected to the temporary character of the toilets as well as to their location and appearance. Whether the toilets were later removed, as the City represented to us in oral argument, without contradiction, is not significant. There is no evidence that lack of permanent toilets unreasonably interfered with the use and enjoyment of their properties by the complainants. Only Hertzler testified to any annoyance caused by visitors relieving themselves in the Park. His testimony related to a few isolated incidents and to an unpleasant odor which he described at the first hearing. There is no evidence that these annoyances had recurred at the time of the second hearing, when Hertzler's testimony focused on the unsightly appearance of the portable toilets, or that the conditions to which he had previously testified constituted a health hazard or unreasonably interfered with his use and enjoyment of his property. The portable toilets facing his house, while undoubtedly offending the aesthetic sensibilities of the Hertzlers and, indeed, of the chancellor, were not sufficient to constitute a nuisance. *See Zey* v. *Long Beach*, 144 Wash. 582, 258 P. 492 (1927).

The number, size and shape of shrubs forming the buffer zone, and the appearance of the parking lot, also annoyed Hertzler, but, again, the City's actions in resolving these aesthetic problems were not sufficient to constitute a nuisance. City beautification arouses strong differences of opinion among reasonable persons, and what may be offensive to some citizens may appear attractive to others.

At the first hearing, before trash receptables had been placed in the Park, Hertzler testified that he had seen trash and debris in the area of the Park and that some of it overflowed onto the property of unidentified adjacent landowners. At the second hearing he testified that the trash problem had not been alleviated because the trash receptacles had not been placed in appropriate locations. There is no evidence that at the time of this hearing any trash or debris was littering the property of Hertzler or of any other complainant. Moreover, the presence in the Park of trash and debris, while unsightly, is not an abatable nuisance, even if occasionally the refuse should be carried onto Hertzler's property. See State Board Commission v. Oakes, 150 W. Va. 709, 719-20, 149 S.E.2d 293, 300 (1966).

The evidence upon which the chancellor relied to find lack of adequate police supervision related to such violations of the criminal laws as drinking in public and noisy operation of motor vehicles. Hertzler's testimony failed to supply any information as to the number of times that these incidents had occurred. Hertzler admitted that when he reported one incident to the police they responded but arrived after the alleged offenders had departed. There was no evidence that Hertzler had at any other times requested police assistance.

The evidence of complainants fails to establish that the noise in the Park unreasonably interfered with their use and enjoyment of their properties. More than sporadic or isolated annoyances must be shown. See Senatore v. Blinn, 342 Mass. 778, 174 N.E.2d 437 (1961). The interference must be substantial. See Robie v. Lillis, 112 N.H. 492, 299 A.2d 155, 158 (1972); Lieberman v. Township of Saddle River, et al, 37 N.J.S. 62, 116 A.2d 809 (1955); 58 Am. Jur.2d Nuisances § 45, Extent or Degree of Injury or Annoyance, pp. 610-611. Thus, in Herring v. Wilton, 106 Va. 171, 55 S.E. 546 (1906), we affirmed a decree awarding injunctive relief to a neighbor against the owner of dogs that howled and barked continuously and thereby unreasonably and unnecessarily interrupted the rest of the complainant and his family and "seriously disturbed" them in the reasonable use and enjoyment of their home. No such evidence is found in the present record. The uncontradicted evidence is that, by the time of the second hearing, the City's park rangers and police officers were regularly patrolling the Park each night as well as each day. The rangers, who maintained records of their patrols, found no serious misconduct that required them to arrest Park visitors.

Hertzler attaches undue significance to the testimony of Tekinder that the rangers did not make arrests of persons for drinking in pub-

lic. We believe that a fair inference from the agreed statement of fact as to Tekinder's testimony is that arrests would be made by rangers for any "blatant" or aggravated situation. There is no evidence of any reluctance on the part of police officers to arrest for any violations of the criminal laws or of any unwillingness on the part of the rangers to take whatever action might be required to control and regulate the conduct of Park visitors.

More significantly, where a municipality has the right to operate a particular facility, such operation ordinarily would not constitute an actionable nuisance unless it was negligently performed. *See Virginia Beach* v. *Steel Fishing Pier*, 212 Va. 425, 184 S.E.2d 749 (1971). Generally, no action will lie for loss or inconvenience arising from the performance of an authorized act in an authorized manner. *See Fisher* v. *Seaboard Air Line Co.*, 102 Va. 363, 367, 46 S.E. 381, 384-85 (1904). In such circumstances resulting damages are an unavoidable concomitant of the sanctioned activity. There is no allegation or finding that the City negligently operated the Park, and the evidence is not sufficient to permit a reasonable inference of negligence in its operation at the time of the August 1, 1974, hearing. Therefore, the finding that the City maintained a nuisance is unsupported by the evidence and the final decree awarding injunctive relief to appellees must be reversed.

In view of our holding we find it unnecessary to decide whether the trial court erred in overruling the Special Plea of the members of City Council that they were not proper parties to the litigation.

*Reversed and final decree.*