## Richmond

### FREDERICK LYNWOOD FOLEY, ET AL.

### V.

### CURTIS L. HARRIS, ET AL.

January 22, 1982.

Record No. 790983.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ.

*Ebb H. Williams, III,* for appellants.
*Philip G. Gardner (Gardner & Gardner,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the Court.

The dispositive question in this appeal is whether the chancellor was correct in ruling that certain restrictive covenants applicable to lots in a subdivision had been violated and in enjoining such violations.

Curtis L. Harris and Edith G. Harris, husband and wife, and other owners of lots in Woodland Heights Subdivision[1] near Martinsville filed their petition for a permanent injunction in the trial court to enjoin Frederick Lynwood Foley and OK-Soon K. Foley, husband and wife, from maintaining a mobile home and wrecked automobiles on Lots 23 and 24, Section E of the subdivision. At the conclusion of the presentation of evidence, heard *ore tenus* by the chancellor, the complainants were granted leave to amend their petition to allege that the mobile home and wrecked automobiles were being maintained by the Foleys on Lot 25, Section E.

After twice viewing the property, the chancellor filed a written opinion in which he stated his findings that the Foleys occupied a house-trailer on their lot and that for some years "old abandoned cars" and an "old van that is used as a tool shed" had been on the lot. He found that some cars were moved off and others moved onto the lot, that the number on the property at any one time varied from six to sixteen, and that at the time of the hearing there were six, four of which could not be moved under their own power.

The chancellor concluded that the restrictive covenants apply to the Foley property, that the house-trailer is forbidden by the covenants, "whether specifically or by implication," and that the "old abandoned automobiles are offensive, unsightly, objectionable and constitute a 'nuisance' " also prohibited by the covenants. By decree entered April 25, 1979, he permanently enjoined the Foleys from maintaining a mobile home or house-trailer and keeping "junked, abandoned, or disabled vehicles" on their property. The decree ordered the Foleys to remove the house-trailer and vehicles

---

[1] Benny M. Galloway and Patricia O. Galloway, and William G. Harris.

within thirty days, but suspended execution of the order pending disposition of this appeal.

The restrictive covenants in question are the following:

* * *

2. Any building other than a dwelling house and its necessary and proper out-buildings constructed upon the lot hereby conveyed shall be built only with the written consent of three-fourths of the then lot owners on Forest Road, or with the consent of the Committee.

3. No nuisance shall be maintained upon the lot hereby conveyed nor upon any lot on Forest Road . . . .

* * *

5. No dwelling shall be constructed upon any lot less than 100 feet in width, which residence shall contain at least 1200 square feet of living area.

The Foley lot fronts an indeterminate distance on the west side of Forest Road, at or near its terminus in a cul-de-sac. The front line of Lot 25 and its common sideline with Lot 26, as shown on the plat, have never been completed to establish the boundaries and dimensions of these properties. Foley, who acquired title to Lot 25 from his mother in 1969, has been living in the mobile home continuously since he placed it on the lot in 1968. In 1977, he and his wife acquired title to Lots 23 and 24, Section E, of the subdivision.

Two recorded plats of Woodland Heights, dated June 30, 1964, and May 10, 1965, respectively, show a total of sixty-three lots, all fronting on Forest Road. The chancellor ruled that the lots shown on the two plats comprised one subdivision to which the same restrictive covenants applied, and this ruling is not challenged on appeal. At least forty-one of the sixty-three lots are less than one hundred feet in width. Because of the incomplete description of Lot 25, the width of that lot cannot be determined.

The complainants owned homes in the subdivision. Curtis L. Harris and his wife owned Lots 20, 21, and 22 of Section E, north of Lot 23 and fronting on the west side of Forest Road. Benny M. Galloway and his wife owned Lots 24 and 25 of Section D, north of the Foley lot and fronting on the east side of Forest Road. William G. Harris owned Lots 29 and 30 of Section D, also north of the Foley lot and fronting on the east side of Forest Road.

Galloway testified that he valued his home, built on two lots, at $58,500. He estimated that homes in the subdivision ranged in value from $35,000 to $75,000. Galloway testified that the Foleys' mobile home and automobiles were visible from Forest Road, were unsightly, and devalued the neighborhood. The vehicles appeared to Galloway to be stationary and disabled. He acknowledged that the value of his home had increased since he purchased it in 1969, and that when he moved into his home in that year there was a mobile home on property of R. G. Dagenhart and one on property of Roy Lawrence.

William G. Harris testified that he could see the Foley mobile home from his backyard and that he found it and the "alleged junk automobiles" to be "offensive, obnoxious, and unsightly." He acknowledged that in 1965, when he purchased his property, the mobile home on the Lawrence property was being used.

Curtis L. Harris, who introduced various photographs into evidence, testified that he could see the mobile home and automobiles from inside his house, from his carport, his backyard, and from the cul-de-sac. Harris said that there were as many as fourteen to sixteen cars on the Foley property at various times and that he had never seen Foley working on any of them. At the time of trial, there were seven automobiles on the Foley property, some of which had never been moved since Harris had been living in the subdivision. Harris asserted that the mobile home and cars interfered with his and his wife's enjoyment of their property, made them "self-conscious about inviting people over for cookouts," and devalued the property, although he conceded that his property had appreciated in value since he purchased it in 1976. Harris testified that he had not seen the Foley or Lawrence mobile homes before purchasing his property.

Stanford L. Finney, a local real estate broker, testified for the complainants as an expert on real estate values. He testified that the automobiles appeared to be "junk" and that the presence of the mobile home and automobiles depressed the value of other property in the neighborhood. The Foleys objected, on hearsay grounds, to a statement made by Finney on cross-examination that a prospective purchaser of the Curtis Harris property became disinterested upon viewing the mobile home and automobiles. The chancellor overruled the objection.

Called as an adverse witness, Frederick Foley testified that the mobile home and automobiles were on his property, that the mo-

bile home, which was his residence, was ten feet by fifty feet, was underpinned, and was served by a septic tank and water. Foley stated that he was using a portion of an old van as a storage shed.

Several landowners in the subdivision testified for the Foleys. Their first witness was Ida Oakes, Frederick Foley's mother. She testified that when she purchased Lot 25, prior to selling it to Foley, the seller's agent told her that mobile homes were permitted on the property. The complainants objected to this testimony as hearsay, but the chancellor, though agreeing that the statement was hearsay, admitted it into evidence. Oakes testified that she did not feel that the mobile home would devalue her nearby property or other property on the street. She conceded that she resided in another part of the county.

Roy Lawrence testified that he had lived on Forest Road in Woodland Heights for thirteen years and had maintained a mobile home on his property "almost . . . the entire time." Lawrence stated that his mobile home was located behind his house for the use of his mother-in-law, and that he intended to remove it when she died. Lawrence testified that in his opinion mobile homes did not devalue property on Forest Road, and that he had no objection to the Foleys' automobiles.

H. D. Smith, another witness for the Foleys, lived on Forest Road on the same side of the street as the Foleys. Smith valued his property, consisting of a residence and five lots, at $100,000. Smith, who was repairing two old cars on his own property, did not find the Foleys' automobiles offensive, but he admitted that he could not see the Foley property from his property and rarely went to the cul-de-sac.

Milton D. Hatcher, another resident on Forest Road, testified that he found nothing objectionable in the Foleys' mobile home or automobiles. He too admitted, however, that he could not see the Foley property from his property.

Testifying for himself and his wife, Foley stated that he had never received a complaint about his mobile home until Curtis Harris complained to him in 1978. Foley stated that except for being underpinned as required by county ordinance, the mobile home was not permanently attached to the lot, but was registered as a motor vehicle and taxed as personal property. He further asserted that his mobile home was on his lot when Galloway purchased his property. Foley also testified that there were never more than six cars on his property at any one time, that he had

title to these vehicles, that he repaired them as a hobby, and that some remained on his property longer than others because of his difficulty in obtaining replacement parts.

It was stipulated that the testimony of R. G. Dagenhart would be that he had maintained a mobile home on his property for a number of years and did not feel that it would depress property values.

The Foleys first contend that the chancellor erred in ruling that their maintenance of a mobile home on their lot violates the restrictive covenants. They argue that the restrictions specify what is forbidden, and that since mobile homes are not specifically forbidden, the developer had no intention of prohibiting their use. We agree.

■ We construe restrictive covenants strictly against those seeking to enforce them, and we resolve substantial doubt or ambiguity in favor of the free use of property. *Bauer* v. *Harn,* 223 Va. 31, 286 S.E.2d 192 (1982) (this day decided); *Bruton* v. *Wolter,* 216 Va. 311, 313, 218 S.E.2d 438, 440 (1975). In the present case, restriction 2 states that no "building" other than a "dwelling house" may be "constructed" on a lot without the written consent of three-fourths of the Forest Road lot owners. Restriction 5 states that no "dwelling" shall be constructed upon any lot less than one hundred feet in width, and that such "residence" shall contain at least 1,200 square feet of living area.

■ We are unable to say that a house-trailer placed upon a lot is a building *constructed* on the lot within the meaning of restriction 2.[2] Nor can we say that a mobile home is a dwelling *constructed* on the lot within the purview of restriction 5. The use of mobile homes in the subdivision for ten years without complaint is consistent with an intent of the subdivider that the covenants not ban the use of mobile homes. Therefore, we conclude that the language of the covenants does not expressly exclude such use.

■ The complaining landowners argue that the restrictions reveal the clear intent of the developer to require that only substantial residences be built upon substantial lots. Relying upon *Friedberg* v. *Building Committee,* 218 Va. 659, 239 S.E.2d 106 (1977),

---

[2] A house-trailer attached to the realty is generally held to be a building within the meaning of restrictive covenants. *See* Annot., "What Constitutes a 'Building' within Restrictive Covenant," 18 A.L.R.3d 850 and cases cited therein, *e.g., Lawrence* v. *Harding,* 225 Ga. 148, 166 S.E.2d 336 (1969), *Aluminum Company of America* v. *Kohutek,* 455 S.W.2d 789 (Tex. Civ. App. 1970).

they assert that even if the restrictions contain no express prohibition against mobile homes, such living accommodations are nevertheless forbidden by necessary implication. The restrictions, however, prohibit the construction of dwellings upon lots of less than one hundred feet in width. On a lot of one hundred feet or more in width, a dwelling must contain not less than 1,200 square feet of living area. Nevertheless, most of the lots in the subdivision are less than one hundred feet wide. The developer did not choose to eliminate the smaller lots by subdividing the property into lots wide enough to permit construction of houses meeting the minimum requirements of living area. Therefore, the purchaser of one of the smaller lots could only reside upon his land if he did so in a mobile home.

We hold that the complaining landowners failed to sustain their burden of showing that the covenants, ambiguous as to mobile homes, expressly or by implication prohibited the Foleys from residing in a mobile home on their property. The evidence of the complainants only emphasized the ambiguity inherent in the language of the restrictions. We will reverse the decree entered in the court below ruling that the Foleys violated the restrictive covenants by residing in a mobile home on their lot and ordering them to remove the mobile home.

The Foleys also contend that the chancellor erred in enjoining them from keeping the automobiles on their lot. They do not dispute the chancellor's conclusion that a nuisance within the meaning of restrictive covenant 3 is anything that endangers life or health or obstructs the reasonable and comfortable use of property, or an activity which unreasonably interferes with the use and enjoyment of another's property. *See Newport News* v. *Hertzler,* 216 Va. 587, 592, 221 S.E.2d 146, 150 (1976); *Mahoney* v. *Walter,* 205 S.E.2d 692 (W. Va. 1974). The complaining landowners have also accepted this definition of a private nuisance, in construing the restrictive covenant, although they could have sought to enjoin a private nuisance irrespective of the restriction. The Foleys disagree, however, with the chancellor's ruling that their maintenance of the vehicles on their property constituted a nuisance. They argue that the testimony as to diminution in property values was successfully impeached, and the complainants' evidence, therefore, showed nothing more than offended aesthetic sensibilities which, under *Hertzler,* was insufficient to support injunctive relief.

*Hertzler* is not controlling. In that case, nearby landowners sought to enjoin a city from maintaining an alleged nuisance in its operation of a public park. We held that the city had the right to operate the park and, absent negligence, such operation would not constitute an actionable nuisance. We reviewed the evidence, showing unsightly but temporary portable toilets facing the house of one of the complainants, the presence of unsightly trash and litter, and sporadic or isolated instances of noisy behavior in the park, and held that it was insufficient to show an abatable nuisance. The temporary annoyances were problems incident to the opening of the park before permanent arrangements for supervision were completed.

■ The phrase "use and enjoyment of land" is broad. It comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land, which inevitably involves an element of personal tastes and sensibilities, is often as important to a person as freedom from physical interruption with use of the land itself. The discomfort and annoyance must, however, be significant and of a kind that would be suffered by a normal person in the community. *See generally* Restatement (Second) of Torts §§ 821D and 821F (1977), with comments. For judgments for damages arising from a private nuisance see *Nat. Energy Corp.* v. *O'Quinn,* 223 Va. 83, 286 S.E.2d 181 (1982) (this day decided).

■ In the present case, in addition to hearing the testimony of the witnesses, the chancellor viewed the property and confirmed the complainants' testimony in strongly descriptive terms. The complainants also introduced into evidence a Henry County ordinance proscribing unscreened placement of more than five cars, "incapable of being operated," on a lot exposed to the weather. *See also* Code §§ 15.1-11.1 and -28. The evidence permits the reasonable inference that the Foleys were from time to time violating this ordinance.

Foley testified that all the cars on his lot were in various stages of repair as part of his "automobile enthusiast" hobby. The Foleys' witnesses testified that the cars were not offensive to them, but none of them lived within sight of the cars. H. D. Smith testified that he also repaired cars as a hobby on a Forest Road lot, but he stated that he had only two 1940 Fords which he planned to garage in a building then under construction.

The chancellor resolved in favor of the complainants the conflict of competing rights shown by the evidence, finding that the Foleys were maintaining a nuisance in keeping "junked, abandoned, or disabled vehicles" on their lot. The court further found that "the old, battered, abandoned automobiles on the lot in question . . . definitely 'obstruct[ed] the reasonable and comfortable use of property' " of neighbors, and that it would be "very simple and inexpensive" for the Foleys to remove the cars. Where the granting of injunctive relief is based upon findings of fact made by the chancellor who has seen and heard the witnesses, we will not disturb the decision unless it was plainly wrong or without evidence to support it. *McCauley* v. *Phillips,* 216 Va. 450, 219 S.E.2d 854 (1975). The evidence fully supports the chancellor's finding of a nuisance and we will not disturb the granting of an injunction based upon this finding.

Lastly, the Foleys contend that the chancellor erred in his treatment of the alleged hearsay testimony of Stanford Finney, the complainants' expert on real estate values. On direct-examination, Finney expressed his opinion that the junk cars and mobile home depressed property values along Forest Road. On cross-examination, the Foleys asked Finney to explain the basis of his opinion. Finney replied that a prospective purchaser of the Curtis Harris property became disinterested when he saw the mobile home and junk cars. The Foleys objected to this testimony as hearsay but the chancellor overruled the objection. In his opinion, he referred to this statement in summarizing Finney's testimony.

It is permissible for an expert witness to give reasons for his opinion, but if he testifies to information received from other sources, such information may be considered only for the purpose of determining what weight should be given to the expert's conclusion. *See Whitworth* v. *State Highway Commissioner,* 209 Va. 95, 99 n.2, 161 S.E.2d 698, 701 (1968). Finney's statement, therefore, was admissible for that purpose. Although the Foleys did not request the chancellor to so limit the use of the statement, we will assume, absent a clear showing to the contrary, that he used it for the proper purpose and not as substantive evidence. Accordingly, we reject the argument of the Foleys that the chancellor erred in this respect.

For the foregoing reasons, we will affirm the decree of the trial court insofar as it enjoined the Foleys from keeping "junk" automobiles on their property, and, insofar as it enjoined the

Foleys from maintaining a mobile home on their property, we will reverse the decree and enter a final decree for the Foleys.

*Affirmed in part; reversed in part; and final decree.*