## Richmond

### NATIONAL ENERGY CORPORATION

### V.

### TROY O'QUINN, ET AL.

January 22, 1982.

Record No. 791073.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

Thomas R. Scott, Jr.; N. D. Street (Street, Street & Street, on brief), for appellant.
Robert T. Winston, Jr. (Mullins, Winston & Roberson, on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

This appeal involves the law of private nuisances. When a business enterprise, even though lawful, becomes obnoxious to occupants of neighboring dwellings and renders enjoyment of the structures uncomfortable by virtue of, for example, smoke, cinders, dust, noise, offensive odors, or noxious gases, the operation of such business is a nuisance. *Barnes* v. *Quarries, Inc.*, 204 Va. 414, 417, 132 S.E.2d 395, 397 (1963). The term "nuisance" includes "everything that endangers life or health, or obstructs the reasonable and comfortable use of property." *Id. Accord Newport News* v. *Hertzler,* 216 Va. 587, 592, 221 S.E.2d 146, 150 (1976). *See Foley* v. *Harris,* 223 Va. 20, 286 S.E.2d 186 (1982), decided today. But every trifling or imaginary annoyance that may offend the sensibilities of a fastidious person is not actionable. *Bragg* v. *Ives,* 149 Va. 482, 496, 140 S.E. 656, 660 (1927).

A nuisance may diminish value of realty. The condition also may interfere with some right incident to the ownership or possession of real property. Such interference may be accomplished by substantially impairing the occupant's comfort, convenience, and enjoyment of the property, causing a material disturbance or annoyance in use of the realty. *Virginian Railway Co* v. *London,* 114 Va. 334, 344-45, 76 S.E. 306, 307-08 (1912).

Here, 11 property owners, whose residences were situated in Dickenson County adjacent to State Route 83 and Russell Prater Creek, filed six separate damage suits in 1976 against appellant

National Energy Corporation, the sole defendant below.* Each plaintiff alleged that defendant built a coal tipple with hopper, feeder, and crusher close to their land and began operation of a coal preparation plant. They further asserted that defendant's operation of the facility caused coal dust to be spread over the plaintiffs' properties and homes, and caused loud and excessive noise to be emitted from the plant. These conditions, plaintiffs alleged, decreased the value of their property and deprived them of the quiet, comfortable use of their residences.

In a 1978 jury trial of the consolidated actions, during which the jury viewed the scene, verdicts were rendered in favor of the plaintiffs aggregating $110,000. The trial court overruled defendant's motions to set the verdicts aside and entered final judgment on each verdict in a 1979 order, from which we awarded defendant this appeal.

The following questions, emphasized by defendant on appeal, are dispositive. First, did plaintiffs adduce sufficient evidence to present an issue for the jury that defendant's operation created a nuisance? Second, was the evidence sufficient to show plaintiffs were damaged by the nuisance, and to show the extent and source of the damages? We answer both questions in the affirmative.

■ Under familiar appellate principles, we view the evidence in the light most favorable to the plaintiffs, who are here armed with jury verdicts in their behalf approved by the trial judge.

The situs of this controversy is between Haysi on the west and a plant operated by Clinchfield Coal Company on the east. At the scene, the two-lane state road runs generally east and west being paralleled by the creek to the south. There is a two-lane public bridge over the creek intersecting the road from the south. At that point the road curves almost 90 degrees to the northeast for a vehicle travelling east and to the northwest for a vehicle travelling west.

Defendant's plant was established and began operating in 1975, subsequent to plaintiffs' acquisition of their properties and occupancy of their homes. The plant is situated south of and adjacent to the creek, west of the bridge. The properties and homes involved in five of the suits are located in a row south of and adjacent to the highway, east of the bridge and north of the creek. The

* The plaintiffs in the six actions were: (1) Troy O'Quinn; (2) Janice Owens, Karen Owens, and Sonja Owens; (3) James H. Owens; (4) Calvin Corbett Ratliff and Flora Ratliff; (5) Ledna O'Quinn and Bobby O'Quinn; and (6) Bruce Owens and Leona Owens.

residence nearest defendant's facility is about 325 feet from the plant while the easternmost home is about 635 feet away. The property involved in the sixth suit is located north of and adjacent to the highway, west of the bridge, and about 550 feet from the plant.

At the facility, defendant cleans raw coal. The plant usually operates from 7:00 a.m. to 9:00 p.m., six days a week. The coal is fed through a washer, cleaned, separated from rock, and crushed. The plant consists of a stockpile of coal, begun in 1974, bins, a rock picker, a shaker or vibrator, a washer, and loaders. Defendant also maintains a sludge pond at the site.

Raw coal is brought to defendant's plant in trucks of independent contractors; the trucks approach from both directions on the highway, travel across the bridge, move onto defendant's property, and dump on the stockpile. As the pile builds in height and size, the trucks, carrying about 17 tons of coal, go "right on up the pile with it." The plaintiffs' observation that, at times, the stockpile "is a veritable mountain of coal and coal dust" is confirmed by an examination of the numerous photographs received in evidence depicting views from the ground and air. After dumping, the trucks, driving on the stockpile, travel down and back across the bridge to the highway.

The coal is next handled by highlifts that load it into a bin, or into a truck which places it into the bin. The coal then goes from the bin to the loader, through the rock picker, and onto a beltline. If the coal is washed, it goes into another loader. Sludge from the washing process is carried by defendant's tractor-trailer across the bridge to the sludge pond located just west of the bridge and south of the state road.

A double track of the Haysi Railroad runs parallel to the highway adjacent to defendant's facility between the plant and the creek. The railroad was operating before defendant commenced business. Coal is loaded from defendant's plant onto railroad cars at two sites west of the bridge.

According to plaintiffs' evidence, a huge amount of thick coal dust was generated continuously by defendant's facility during dry weather, from the time defendant began operating the plant to the time of trial. The dust was created, according to the record, by many factors all directly associated with defendant's facility.

For example, as trucks were driven to the stockpile, many overfilled with "graveyard heap[s]," some of the cargo spilled on the

highway and bridge; as trucks were driven from the stockpile, dust, mud, and dirt were tracked from the pile and defendant's property onto the bridge and highway. This accumulation was stirred up and made airborne by other trucks using defendant's facility, as well as by public use of the bridge and highway.

Also, as the trucks were driven onto the stockpile, at a rate of 25 to 50 per day, and the load discharged, considerable dust was thrown into the air. When the coal was lifted by the highlifts, more coal dust was tossed into the atmosphere.

The evidence showed that as the dust scattered from the stockpile, the bridge, and the highway, wind blew the coal particles east and west along the creek, upon the plaintiffs' lands and homes. While the residents of the area experienced some collection of coal dust from highway and railroad use before 1975, testimony showed the amount of coal dust in the immediate area had increased by 75 to 95 percent after defendant began using its facility.

The constant invasion by coal dust and noise resulted in devaluation of the plaintiffs' realty, according to their testimony. In addition, the evidence showed they were materially disturbed in the use and enjoyment of their homes by the dust and noise. The effect was described in different ways.

Testifying about the period after establishment of defendant's facility, witnesses said that when the settled dust is touched, "your hand looks just like you've come out of the coal mines"; that "it's a full time job now trying to keep [the homes] clean"; that the "windowpanes are black"; that, due to the condition, outdoor cooking and recreation have been eliminated; that yard chairs "stay good and black"; that freshly painted window sills become completely covered with coal dust within a month; that small children are not allowed to play outdoors because they get "filthy"; that "the dust it chokes you to death"; that "it's just impossible to try to live in it"; that the situation is one of "almost indescribable filth"; and that a family automobile cannot be cleaned "fast enough to go any where [with a clean car]." As we have already indicated, the photographs in the record graphically depict the size and density of the clouds of coal dust rising from defendant's facility.

The testimony about the increased noise in the area stemming from defendant's operation of the facility was equally as explicit. Witnesses said, "a big clinking noise [was heard] continuously

from the time it [the plant] starts 'til the time it finishes at night"; that "a big old thumping noise" is heard inside the homes every day but Sunday; that "you can hear motors from equipment" constantly; that there is "a continuous roar" from the plant; that "[a]ll day" there is "[m]achinery running, railroad cars being fit together, trucks pulling in and out and the noise on the machinery"; that the "screeching . . . terrible noise" is "just about so much we can't hardly take it"; that operation of the plant "sounds like a large pump or something"; and that "[i]t's so aggravating sometimes you want to leave."

The defendant, through cross-examination and testimony of its own witnesses, sought to show that there had been no substantial increase in dust and noise in the area that was attributable to defendant after the plant became operational. The defendant contended other conditions in the neighborhood materially affected the dust and noise levels there. For example, defendant asserted increased road traffic, resulting from improvements made to the highway in the area, was a significant noise and dust factor. Also, defendant blamed the railroad operations, independent of the plant, for a lot of the noise. In addition, defendant urged that coal being hauled along the highway to the Clinchfield Company's plant site to the east was a source of much of the dust and noise. Defendant also contended that Clinchfield's employees who used the bridge to travel in their vehicles to and from their homes in the area were responsible for spreading much of the dirt and coal dust emanating from the bridge.

On appeal, defendant argues that plaintiffs, as a matter of law, failed to make out a prima facie case that operation of defendant's plant constituted a private nuisance. It also contends plaintiffs did not show with reasonable certainty the amount and source of their damage allegedly caused by dust and noise from defendant's plant.

The mere summary of evidence demonstrates the pure factual nature of the issues presented below. Taken in the light most favorable to the plaintiffs, the record convincingly establishes that defendant's business enterprise created a condition obnoxious to occupants of the neighboring dwellings and obstructed the reasonable, comfortable use of the property. Furthermore, the amount and source of the damage as resulting from defendant's facility was sufficiently proved.

When damages are occasioned by a combination of causes originating from different sources, the jury must determine from the evidence the part attributable to the defendant and the part traceable to other causes. And while absolute certainty in the proof of damages in such a case is not attainable and is not required, the burden is on the plaintiff to produce evidence to show within a reasonable degree of certainty the defendant's share of the damage. *Smith* v. *The Pittston Company,* 203 Va. 711, 715, 127 S.E.2d 79, 82 (1962). *Accord, Finley, Inc.* v. *Waddell,* 207 Va. 602, 151 S.E.2d 347 (1966). This the plaintiffs have done under proper instructions. Apropos this case, the court in *Southern Railway Co.* v. *McMenamin,* 113 Va. 121, 129, 73 S.E. 980, 982 (1912), said:

> "The jury viewed the premises and saw the conditions. The evidence abundantly shows the character of the injury complained of, the conditions under which plaintiffs suffered, and the inconvenience to them in the enjoyment of their property.
>
> "Where the injury is discomfort and inconvenience, the amount of damages must be left to the jury, in view of all the facts."

Defendant also argues that "common sense dictates that coal cannot be mined, transported, stored and delivered without some degree of dust; nor can the [local] economy . . . survive without the coal mining industry." Thus, defendant contends, "it had the right to operate its coal preparation plant and stockpile coal; i.e., it had the right to the natural use and enjoyment of its own property."

We have previously rejected a similar argument, holding that the natural rights of individuals are not inferior to the rights of industry. In *The Pittston Company, supra,* a nuisance case involving a coal preparation plant in Russell County, this Court said:

> "It is generally held that the location of an industry in an industrial area and its importance to the wealth and prosperity of the community do not give to it rights superior to the primary or natural rights of those who live nearby. Locality and surroundings are to be taken into consideration only in determining whether the business or industry is so conducted as to constitute a nuisance as a matter of fact. . . . It is of no consequence that an industry or a business is a useful or

necessary one, or that it promotes the development of the community." 203 Va. at 717, 127 S.E.2d at 83-84 (citations omitted).

Consequently, the issue here is not whether the operation of defendant's plant is reasonable when the character of the region is considered; the issue is whether its operation "caused substantial damage to the plaintiff[s], regardless of the location of the plant and the nature and importance of its operation." *Id.,* 127 S.E.2d at 84. The law does not allow an individual to be driven from his home, or to be forced to live in it in positive discomfort, even though the obnoxious condition may be caused by a lawful, useful business carried on in his neighborhood. *Id.* at 718, 127 S.E.2d at 84.

For these reasons, we hold the trial court correctly submitted to the jury the question whether plaintiffs established that defendant maintained a private nuisance. In addition, we hold the court below properly allowed the jury to assess damages for defendant's conduct in diminishing the value of plaintiffs' properties, for continuously interfering with the enjoyment of that property, and for causing material disturbance or annoyance to plaintiffs in their use and occupation of the property. Finally, we have considered and reject out of hand other issues raised by defendant because they are wholly without merit.

Consequently, the judgments appealed from will be severally

*Affirmed.*