## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Richard A. Pruitt

    v.

The Southland Corp.,
Ralph E. England,
and Janet B. England

    v.

Lawyers Title Ins. Corp.

October 30, 1985

By JUDGE JOHN A. JAMISON

I have before me for decision Mr. Vanderpool's demurrer and motion to dismiss the complainant's bill of complaint and Mr. Skinker's petition for permanent injunction in the above matter.

Mr. Vanderpool argues that the complainant failed to state a cause of action and bases his argument on several grounds. It appears from a careful study of the pleadings and the memoranda of counsel that the subject matter of this suit requires adjudication on its merits which a demurrer might prevent.

I believe that the complainant here does have standing to proceed because of the import of Code Section 55-22. In addition, it would appear that property interests are affected and the complainant may incur some diminution in the value of his contiguous land. It is important to note that an implied reciprocal negative easement may exist if the grantor/developer of both subdivisions is the same individual who intended a common plan and scheme

for the improvement of his entire development, including both Salem Heights and its Route 3 Addition.

However, it appears that the lessors/owners of the property on which the Southland business is situated should have been made parties defendant in order for complete adjudication of the controversy to be had. I therefore feel that the demurrer should be sustained with leave to the complainant to amend the bill of complaint.

August 7, 1987

By JUDGE WILLIAM H. LEDBETTER, JR.

The question presented is whether certain restrictive covenants burden property of the respondents for the benefit of property owned by the complainant.

Counsel have agreed to submit this question on the record title of the properties, as stipulated, without resort to a reference to a commissioner in chancery. Thus, the matter is before the court on the pleadings, twenty-seven stipulations (accompanied by numerous exhibits), and memoranda of law.

Counsel also have agreed that if the court were to find in favor of the complainant on the question now under consideration, all remaining issues, such as the "change of conditions" defense asserted by the respondents, would be referred to a commissioner for evidentiary hearings.

As indicated above, this controversy involves restrictive covenants imposed on real estate, sometimes referred to as equitable servitudes. Pruitt complains that Southland is violating certain restrictions applicable to its property which were imposed for the benefit of Pruitt's property.

In 1945, George Douglas White and Hattie Lee White (the Whites) purchased Green Gate Farm containing 129½ acres located at the intersection of State Routes 3 and 639 in Spotsylvania County. The Whites subdivided a portion of the tract into fifty-three numbered lots and on June 7, 1946, recorded a plat of the subdivision "Salem Heights."

The Whites encumbered the subdivided property with restrictive covenants, which they recorded. These restrictions limited the use of the lots to "residential purposes only," except that Lots 1, 2 and 3 were to be "used for

business purposes." Further, one of the restrictions pro-
hibited the sale of alcoholic beverages "on the three
lots designated as business lots."

Over the years, the lots in Salem Heights were sold
to various grantees, and each off-conveyance deed included
restrictions identical to those contained in the master
list.

Within a few months after the creation of Salem
Heights, the Whites subdivided other acreage of Green
Gate Farm and created "Route 3 Addition to Salem Heights."
A plat was recorded showing lots numbered 54 through 62.

Lots 1, 2 and 3 of Salem Heights front on Route 3,
a major highway. The remainder of the Salem Heights lots
are along Route 639. Lot 54 of Route 3 Addition is contigu-
ous to Lot 1 of Salem Heights; the remainder of the Route
3 Addition lots are to the east along Route 3. As a result,
something approximating an "L" was created, with Salem
Heights lots constituting the vertical line and Route
3 Addition lots constituting the horizontal line.

No master list of restrictions was recorded for
Route 3 Addition. However, in the first off-conveyance
of Route 3 Addition property, the Whites imposed restric-
tions that were said to apply "to each of lots nos. 54
to 62, both inclusive" and "to Route 3 [A]ddition to Salem
Heights."

Unlike the Salem Heights restrictions, the new restric-
tions did not limit the use of any of the lots in Route
3 Addition to residential purposes. Further, the ban on
sale of alcoholic beverages was not imposed specifically
upon Lots 1, 2 and 3 of Salem Heights, but upon "the lots
designated as business lots . . . ." No lots were designated
as business lots.

Similar, though not identical, restrictions were
placed in the various off-conveyance deeds of Route 3
Addition lots.

Also, the Whites sold a 90-acre portion of Green
Gate Farm to Waldo E. Sherman and Emily C. Sherman, and
about ten years later, the Shermans sold the parcel to
Johnson & Glazebrook, a local real estate partnership.
Johnson & Glazebrook subdivided this parcel as "Greengate
Manor - Section One" and imposed restrictions on those
lots by a recorded deed of dedication for Greengate Manor.

The complainant is the owner of Lot 24 in Salem Heights.

The respondents, Ralph E. England and Janet B. England (the Englands), are the owners of Lots 54 and 55 in Route 3 Addition. The respondent, The Southland Corporation (Southland), is lessee of Lots 54 and 55 and operates a Seven-Eleven convenience store on the premises.

It is conceded that Southland uses Lots 54 and 55 for business purposes and that it sells beer and wine there.

Pruitt seeks to enjoin the sale of beer and wine on Lots 54 and 55 of Route 3 Addition. Further, the bill prays for an award of monetary damages.

Pruitt filed his bill on April 6, 1984. Southland demurred. Following a hearing on the demurrer and submission of memoranda, the court sustained the demurrer only on the ground that necessary parties (the Englands) had not been joined. The court rejected Southland's contention that the bill did not state a cause of action.

The Englands were joined in the amended bill otherwise identical to the original pleading. Southland and the Englands filed an answer, and Southland filed a cross-bill. Pruitt responded to the cross-bill and then, with leave of court, filed a third party pleading against Lawyers Title Insurance Corporation. Lawyers Title answered the third-party bill.

On May 18, 1987, Pruitt renewed his request that the cause be referred to a commissioner. Southland argued that the threshold question (framed above) could be decided on the record title of the properties without a reference to a commissioner, and that such a procedure would save the parties considerable time and expense. After inquiries from the bench, it was determined that the litigants were willing to stipulate facts to enable the court to decide such question, and that, therefore, by agreement, the question would be submitted on stipulation of facts and memoranda of law. (In his memorandum filed July 21, 1987, Pruitt says on page 2 that "the court required the parties to file a stipulated statement of facts as to title and memoranda of law . . . ." As explained above, counsel *agreed* in open court on May 18, 1987, to proceed in this fashion, so the quoted statement in the memorandum is

not an accurate description of the process by which this matter is now before the chancellor.)

Pruitt frames the issue in his memorandum as follows: Does the complainant have standing to enforce the alcohol restriction against the respondent?

First, however, the court must ascertain the "alcohol restriction" to which Pruitt refers.

An "alcohol restriction" appears in the chain of title of all lots in Salem Heights. It is included in the recorded master list of restrictions and in all of the off-conveyance deeds. That restriction expressly prohibits the sale of "beer, wine or intoxicating liquors." The restriction is specifically applicable to "the three lots designated as business lots for a period of fifty years (50)." Without doubt, the three lots to which the restriction refers are Lots 1, 2 and 3 of Salem Heights. Those three lots, located on Route 3 and exempt from the "residential purposes only" restriction, are designated as business lots elsewhere in the restrictive covenants.

In the off-conveyance deed of Lots 54 and 55, Route 3 Addition, the Whites imposed eight restrictions identical to the Salem Heights restrictions. In describing the lots conveyed, the deed incorrectly referred to the plat of Salem Heights. Lots 54 and 55 do not appear on that plat. Because of the inaccurate plat reference, a deed of correction was recorded some 14 years later in 1961. That deed corrected the plat reference so that the lots were described by reference to the plat of Route 3 Addition. In addition, the deed of correction "revoked" the restrictions imposed in the earlier deed and imposed "correct and proper ones." The new restrictions made a change in the wording of the "no alcohol" prohibition. Rather than referring to "the three lots designated as business lots," the new restrictions applicable to lots 54 and 55 referred to "the lots designated as business lots." In other words, the word "three" was omitted.

Based on the foregoing, it is clear that the restrictions that burden Lots 54 and 55 are those found in the deed of correction dated May 1, 1961, between the Whites and the respondents' predecessor in title.

But that does not end the inquiry. The parties disagree as to the proper interpretation of the restriction. The respondents contend that the restriction applies only

to Lots 1, 2 and 3 of Salem Heights. Pruitt has developed an interesting but unconvincing argument that by the omission of the word "three" in the deed of correction, and in other deeds to lots in Route 3 Addition, the Whites intended to expand the effect of the "no alcohol" restriction to all lots that might be used as business lots.

The court cannot reach such a conclusion.

It is obvious that from the beginning the Whites wanted to create an exclusively-residential development along Route 639. No commercial activity was permitted on any of those lots, which were designated as Lots 4 to 53 of Salem Heights. It is just as obvious that the Whites, recognizing the realities of marketing and foreseeing land development trends in Spotsylvania County, wanted to sell their property along Route 3 unencumbered by any such residential use restriction. At the time that they were creating Salem Heights, the property on Route 3 which they platted for sale consisted only of Lots 1, 2 and 3. Lots 1, 2 and 3 were contiguous to one of the residential lots in Salem Heights and were located at the intersection with Route 639 which provided the only access to the residential lots of Salem Heights. Considering the sort of businesses that would engage in selling and serving alcoholic beverages in 1947 (convenience stores and self-service gasoline stations with carry-out facilities had not yet begun to grace the countryside), the Whites imposed a total ban on that particular type of commercial activity specifically applicable to Lots 1, 2 and 3.

Later, when the Whites platted Route 3 Addition, restrictions that they incorporated in the various lot deeds prohibited the sale of alcoholic beverages "on the lots designated as business lots." Thus, except for the deed by which Lots 54 and 55 were originally conveyed, the word "three" was dropped. Nevertheless, the prohibition continued to apply only to those lots "designated as business lots."

As noted above, Pruitt contends that the language of the covenant acquired a new meaning with the advent of the Route 3 Addition and the elimination of the word "three."

If a business use is made, then it is a business lot. The low owner must conduct his business

use in accordance with the restrictions applicable to designated business lots. (Memorandum of Complaint filed 7/21/87, page 12.)

However, the restriction does not prohibit sale of alcoholic beverages on all lots which, now or in the future, may be *used* as business lots. It prohibits sale of alcoholic beverages on those lots *designated as business lots.* The only lots so designated in either the Salem Heights subdivision or the Route 3 Addition subdivision are Lots 1, 2 and 3. The court is of the opinion that the restriction cannot be construed to extend to Lots 54 and 55 merely because they are now used as business lots.

Restrictive covenants are strictly construed, and doubt or ambiguity is resolved in favor of the free use of land. *Foley v. Harris*, 223 Va. 20 (1982).

Even if the language of the restriction could be given such an expanded interpretation and applicability, the court concludes, for the reasons detailed below, that Pruitt is not an intended beneficiary of the restriction, insofar as such restriction burdens Lots 54 and 55. Stated another way, the evidence shows that the restrictive covenants imposed upon Lots 54 and 55, however they may be interpreted and applied, are not for the benefit of Pruitt and the other lot owners of Salem Heights.

Pruitt's primary premise, and the starting point for most of his analysis, is that all of the lots that the Whites subdivided in 1946-1947 (i.e., Salem Heights consisting of Lots 1 to 53, and Route 3 Addition consisting of Lots 54 to 62) were intended as one development, with a common scheme and essentially similar restrictions, burdening all of the lots for the benefit of all the others.

Without revisiting the entire history of the law of restrictive covenants, it is well known that modern property law jurisprudence is quite familiar with reciprocal negative easements. Restrictive covenants are sometimes referred to as "negative easements." They are "reciprocal" when the subdivided lots began with a common owner, the lots are so situated as to bear a relation, and the common owner sells one lot with restrictions of benefit to the others. In such event, the servitude becomes mutual. In subdivisions, it is now common to encumber all lots in

the subdivision with servitudes that are for the benefit of all other lots in the subdivision, and this doctrine of reciprocity, or mutuality, entitles the owner of any lot to enforce the covenants against the owner of any other lot.

The doctrine has been extended so that in certain circumstances the burdens and benefits of reciprocal negative easements will be implied. This is known as "implied reciprocal negative easements."

> [A]n implied reciprocal negative easement, or equitable servitude, exists when a common grantor develops land for sale in lots and pursues a course of conduct which indicates an intention to follow a general scheme of development for the benefit of all lots, and in numerous conveyances of such lots, he imposes substantially similar, uniform restrictions relating to use of the property. *DuVall v. Ford Leasing Development Corp.*, 220 Va. 36 (1979).

Application of this legal principle almost always occurs in cases involving a residential subdivision in which the developer imposes uniform restrictions in most of the lot deeds but fails to do so in others. Because of the commonality of the restrictions, and the uniform scheme of development, lot purchasers are on notice, and equity reasonably imposes, by implication, the same servitudes throughout the subdivision.

Pruitt argues for application of the principle here because he says, Salem Heights and Route 3 Addition comprise one continuous and "general scheme of development" by a common grantor, the Whites. He cites seven factors gleaned from the land records which "show this intent for a general scheme of development."

It is not necessary to address the strengths and weaknesses of each factor cited in the complainant's memorandum. There can be no "general scheme of development" when one subdivision (Salem Heights) was clearly intended as exclusively residential, except for three lots along Route 3, while the other subdivision (Route 3 Addition), subsequently platted and developed, was not intended as a residential subdivision. Salem Heights was envisioned

as a residential subdivision, primarily located along the less-travelled Route 639, created as such, specifically restricted as such, and maintained as such through a master list of restrictions that were never amended or varied. The only exceptions were the three lots on Route 3, which were treated differently for the practical reasons discussed above. In contrast, Route 3 Addition was comprised of only nine lots, all fronting on Route 3, marketed without any residential use restrictions whatever. It is obvious that the Whites anticipated that these lots would or could be commercial properties, and it was their intention to permit such development on them.

When a tract of land is developed in stages, or piecemeal, over a period of years, and distinct subdivisions are created so that the course of conduct of the developer does not indicate an intent to establish reciprocal benefits and obligations among owners of lots in the different sections, reciprocal negative easements will not be implied. *DuVall, supra.* Further, restrictions binding on lots in one subdivision are not for the benefit of, or enforceable by, lot owners in an adjoining subdivision subject to like restrictions. *Meagher v. Appalachian Power Co.*, 195 Va. 138 (1953).

Because the court concludes that there can be no "general scheme of development" between one group of lots primarily designed as a residential subdivision and another group of lots intended for commercial or mixed use, there can be no implied reciprocity of enforcement. The restrictions imposed upon Salem Heights were intended to benefit the lot owners in Salem Heights, and the restrictions imposed upon Route 3 Addition were intended to benefit the lot owners in Route 3 Addition; and equity cannot imply an inter-subdivision reciprocity under such circumstances.

Finally, it should be noted that the principle of implied reciprocal negative easements does not apply where the land sought to be encumbered with implied restrictions is already encumbered with express restrictions. The very purpose of implied reciprocal negative easements is to impose upon subdivided land certain uniform restrictions where it is obvious from the general scheme of development that the restrictions were intended to be uniformly imposed, for the benefit of all other lots, and under such circum-

stances that the owner of the lot in question cannot fairly and reasonably claim that he had no notice, actual or constructive, of such common scheme. Conversely, if various subdivided properties are subject to express restrictions, there is nothing to imply. This is especially true when the express restrictions are different from those which other lot owners seek to impose by implication. "What may be implied must give way to what is actually expressed." *Forbes v. Shaefer*, 226 Va. 401 (1983).

In the first off-conveyance deed of a Route 3 Addition lot, the restrictive covenants were said to be expressly applicable to Lots 54 to 62, i.e., to the Route 3 Addition lots. The same language appears in the 1961 deed of correction for Lots 54 and 55 between the Whites and the respondents' predecessor in title. In light of this specific language applying the enumerated restrictions to Lots 54 to 62 (i.e., Route 3 Addition), it. is difficult to understand how the restrictions can be applied, by implication, to benefit lot owners outside these Lots 54 to 62.

The court acknowledges that one of the lot deeds in Route 3 Addition, the deed by which the Whites conveyed Lots 56 and 57, contains certain provisions which indicate that the Whites intended to impose all of the Salem Heights restrictions on Lots 54 to 62 except for a few specified variations. The language is somewhat inconsistent with the enumerated restrictions in the same instrument, and such language does not appear in any of the other deeds of Route 3 Addition lots. Such recitations in that one deed cannot be said to create the mutuality or reciprocity needed to create a "general scheme" that would entitle a lot owner in Salem Heights to enforce restrictions applicable only to Route 3 Addition lots against a lot owner in Route 3 Addition.

In an opinion dated October 30, 1985, incorporated in an Order entered on December 1, 1985, this court ruled that the bill stated a cause of action and that the complainant could proceed to an adjudication of the merits because of the import of Virginia Code § 55-22. In his memorandum filed July 21, 1987, Pruitt seems to suggest that that ruling disposed of any doubt about his standing to enforce the restrictive covenant. Such suggestion ignores the nature of a demurrer and the intended scope of the court's earlier ruling.

A demurrer questions the sufficiency of the allegations in the pleading to which it is directed. For the purpose of a demurrer, the facts asserted in the disputed pleading are admitted as true. A demurrer is an allegation that, even if the facts as stated in the pleading be true, yet their legal consequences are not such as to put the demurring party to the necessity of answering them or proceeding further with the cause.

At that juncture, the court was accepting as true all allegations in the bill and was ruling on the sufficiency of those allegations. The question now presented is not the sufficiency of the pleadings, but the sufficiency of the evidence.

Based on the evidence, the court is of the opinion that the prohibition against the sale of alcoholic beverages contained in the restrictions applicable to Lots 54 and 55 is not for the benefit of the owner of Lot 24 and, accordingly, the relief sought in the bill will be denied.