573 S.E.2d 289

7–ELEVEN, INC., f/k/a The Southland Corporation,

v.

The DEPARTMENT OF ENVIRONMENTAL QUALITY.

Record No. 2380–01–2.

Court of Appeals of Virginia,
Richmond.

Dec. 10, 2002.

378

Wyatt B. Durrette, Jr. (Derrick L. Walker; Durrette, Irvin & Bradshaw, P.L.C., on briefs), Richmond, for appellant.

John R. Butcher, Senior Assistant Attorney General (Randolph A. Beales, Attorney General, on brief), for appellee.

Present: BENTON, ANNUNZIATA and HUMPHREYS, JJ.

HUMPHREYS, Judge.

7–Eleven, Inc. ("7–Eleven") appeals a decision of the circuit court upholding a determination of the Department of Environmental Quality denying 7–Eleven full reimbursement from the Virginia Petroleum Storage Tank Fund for third-party

damages. 7–Eleven raises four issues on appeal. For the reasons that follow, we affirm the decision of the trial court.

## I. Background

### A. Underlying Facts

In 1988, Hechinger, Inc. purchased a parcel of real property located in Henrico County, Virginia. The property was located near a parcel of property leased by 7–Eleven, Inc. (f/k/a) Southland Corporation. On June 11, 1990, 7–Eleven reported to the State Water Control Board (the "Board") a leaking seal on an unleaded gasoline pump located on the property. Two days later, an environmental consultant hired by 7–Eleven found gasoline in a spring and stream located on the nearby Hechinger property.

7–Eleven subsequently hired a contractor to clean the affected areas, including those areas located on the Hechinger property. During the clean-up process, which was not concluded until September 1998,[1] 7–Eleven requested reimbursement from the Board for expenditures involved in correcting the petroleum release, pursuant to Code § 62.1–44.34:11(A)(2)(a) of the statutes governing the Virginia Petroleum Storage Tank Fund (the "Fund").[2] Accordingly, the

---

1. Although the clean-up efforts were concluded in September of 1998, it is undisputed that evidence before the Board indicated that the property would not return to its pre-injury state for some years later, the time necessary for natural attrition to take place.

2. The relevant provisions of Code § 62.1–44.34:11, governing the Virginia Petroleum Storage Tank Fund, as they read at the time of the incident, stated the following:

The Fund shall be administered by the Board consistent with the provisions of Subtitle I of the federal Solid Waste Disposal Act (P.L. 98–616, § 9001 et seq.) and any approved state underground storage tank program and in accordance with the following provisions:

\* \* \* \* \* \* \*

2. Disbursements from the Fund may be made only for the following purposes:

a. Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground

Board, acting through its staff, the Department of Environmental Quality ("DEQ"), reimbursed 7–Eleven for $408,838.74 of its incurred clean-up expenditures.[3] The corrective action only partially abated the gasoline plume in the groundwater.

Hechinger filed a motion for judgment against 7–Eleven in the Alexandria Circuit Court on April 19, 1995. On October 15, 1996, Hechinger filed an amended motion for judgment. The amended motion for judgment contained four counts with causes of action including negligence, trespass, nuisance, and statutory liability under Code § 62.1–44.34:18(C)(4), and sought damages of $2,000,000 plus interest, costs, and attorneys' fees.[4] Shortly thereafter, 7–Eleven stipulated to statu-

storage tank which are in excess of the per occurrence financial responsibility requirement imposed in § 62.1–44.34:12, up to one million dollars.

b. Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by § 62.1–44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

3. This amount was beyond the $50,000 7–Eleven was required to maintain as evidence of financial responsibility, pursuant to Code § 62.1–44.34:12(B).

4. Code § 62.1–44.34:18 provides as follows, in relevant part:

C. Any person discharging or causing or permitting a discharge of oil into or upon state waters, lands, or storm drain systems within the Commonwealth, discharging or causing or permitting a discharge of oil which may reasonably be expected to enter state waters, lands, or storm drain systems, or causing or permitting a substantial threat of such discharge and any operator of any facility, vehicle or vessel from which there is a discharge of oil into or upon state waters, lands, or storm drain systems within the Commonwealth, or from which there is a discharge of oil which may reasonably be expected to enter state waters, lands, or storm drain systems, or from which there is a substantial threat of such discharge, shall be liable to:

\* \* \* \* \* \* \*

4. Any person for injury or damage to person or property, real or personal, loss of income, loss of the means of producing income, or

tory liability under Code § 62.1–44.34:18(C)(4). The case subsequently went to trial on the issue of damages. After a day and half of trial proceedings, the parties agreed to a settlement of $575,000.

### B. Administrative Hearing

By letter dated May 1, 1996, 7–Eleven notified the Board of its potential claim against the Fund for third-party damages due to Hechinger, pursuant to Code § 62.1–44.34:11(A)(2)(b). 7–Eleven notified the Board of the settlement on September 23, 1997. The DEQ held an informal fact-finding proceeding on July 12, 2000 to consider 7–Eleven's claim for reimbursement. The DEQ also allowed both parties to submit additional evidence subsequent to the hearing.

The evidence presented on the issue of damages included appraisals prepared by each party's expert witnesses, depositions of each of the experts, and Henrico County tax assessment records. The evidence demonstrated that Hechinger had purchased the property at issue in 1988 for a purchase price of $903,117. However, Hechinger's expert, Salzman Real Estate Services, Inc. ("Salzman"), opined that the pre-injury fair market value of the property was $1,300,000 ($124,-820 per acre). Salzman did not offer an opinion as to the post-injury fair market value of the property. Yet, Salzman opined that Hechinger lost rental income in the amount of $710,000, and investment returns in the amount of $550,000, as a result of the environmental damage. Salzman further opined that Hechinger had to pay $283,000 in taxes, insurance, administration expenses, as well as legal fees and expert fees, that it would not have had to pay but for the contamination.

Jay B. Call, III Associates, Inc. ("Call"), an expert providing evidence on behalf of 7–Eleven, estimated the property's pre-injury fair market value as only $715,000 ($68,651 per acre). Salzberg Appraisals, Inc. ("Salzberg"), another expert for 7–

---

loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge.

Eleven, estimated the post-injury fair market value of the property to be $520,750 ($50,000 per acre). Salzberg based its opinion on an assumption that the contamination was no longer present and that the lower property value was merely a result of topographical problems that Salzberg described as "severe." Henrico County tax assessment records appraised the property at a pre-injury value of $938,700 ($90,130 per acre), and a post-injury fair market value of $508,700 ($48,843 per acre). However, the County based its reduced assessment amount on the estimated cost to perform remediation on the property, which had already been largely completed, and for which the Board had already reimbursed 7–Eleven.

The evidence further established that Hechinger listed the property for sale in 1990, prior to the discovery of the contamination, asking for a price of $1,550,000. Hechinger was ultimately offered $800,000 for the property in 1996. In determining the amount 7–Eleven was entitled to for reimbursement, the hearing officer, J. Andrew Hagelin, Director of the Office of Spill Response and Remediation, stated the DEQ's interpretation of the standard to determine "reasonable and necessary" costs for third party claims as follows: 1) the claimant's legal liability for third party damages must be at least disputable; 2) the amount of damages claimed must be supported by the evidence; and 3) the types of damages must be eligible pursuant to the Fund's Guidelines.

After concluding 7–Eleven's liability was at least disputable, the hearing officer evaluated legal precedent concerning the availability of damages. The hearing officer considered "whether (i) the facts justif[ied] permanent, temporary or both types of damages; (ii) whether an adjustment for the partial cure of the Hechinger property should be applied; and (iii) whether an adjustment for multiple causes of damages applie[d]." He concluded as follows:

Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take for natural attention [sic] to return the site to background levels. [7–Eleven] provided no evidence and

no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame. Consequently, it is appropriate to treat the injury as permanent. That measure for permanent injury to real property pursuant to *Packett v. Herbert* [237 Va. 422, 377 S.E.2d 438 (1989),] is the permanent dimunition in the value of property.

To determine the permanent dimunition in the value of the property, the fair market value of the property after the injury is subtracted from the fair market value of the property before the injury.

In making this determination, the hearing officer disregarded the expert opinions of Salzman and Call as not credible, because they valued the property well above the amount Hechinger paid for it, and well above the county assessment amount. Further, they did not offer post-injury fair market valuations and offered damage estimates using formulae other than that prescribed in *Packett*.[5] The hearing officer also disregarded the opinion of Salzberg because the post-injury evaluation offered assumed no contamination was present on the property. In addition, the hearing officer disregarded the county's assessed post-injury value, because it reflected the estimated clean-up costs that the Board had already paid to 7–Eleven.

Based on the remaining evidence, the hearing officer found a reasonable range for the pre-injury fair market value of the property was $903,177 to $938,700, the pre-injury county assessment amount and the actual purchase price Hechinger paid for the property just two years before the pollution report. He found the 1996 offer of $800,000 to purchase the property a reasonable basis for estimating post-injury fair market value, as most of the clean-up expenses had already been incurred and it was not unreasonable to assume the potential buyer was aware of the condition of the parcel, and that the condition was reflected in the offer price. According-

---

5. *See Packett,* 237 Va. at 426–27, 377 S.E.2d at 442–43.

ly, he awarded 7–Eleven $103,117 ($903,117–$800,000) in reimbursement for third-party claim costs, finding this amount of damages most accurately reflected the actual market value of the property.[6]

## C. Circuit Court Appeal

7–Eleven appealed this finding to the Richmond Circuit Court arguing that the hearing officer 1) failed to consider important factors in analyzing the reasonableness of the settlement; 2) misunderstood and misapplied the law of damages; and 3) arbitrarily and capriciously rejected the opinions of certain experts. 7–Eleven further contended that the Fund's Guidelines conflicted with Code § 62.1–44.34:11(A)(2)(b). 7–Eleven asserted that each of these issues constituted matters of law, requiring little deference to be given to the determination of the DEQ.

Following written briefs and oral argument, the trial judge issued a letter opinion finding the decision concerning "reasonable and necessary per occurrence costs" was an area involving the special expertise of the DEQ, entitling its decision to deference and making the appropriate standard of review whether the decision was supported by substantial evidence. Finding that the decision was both supported by the evidence and not arbitrary and capricious, the trial court upheld the DEQ's decision.

## II. Analysis

## A. Standard of Review

On appeal, 7–Eleven first contends that the circuit court employed an inappropriate standard of review in considering the DEQ's determination. Specifically, 7–Eleven contends that the substantial evidence standard is inapplicable to ques-

---

6. The hearing officer found that no adjustment was necessary for partial cure costs and/or the potential reduction in value of property due to the topographical problems, as he found the $800,000 offer reflected an arms-length offer made at a time when the cure of the property was nearly complete.

tions of law and that judicial deference to the DEQ is inappropriate in matters outside the scope of its specialized competence and expertise. We don't disagree with this basic statement of the law.

> Judicial review of agency decisions is authorized by the [Virginia Administrative Process Act]. *See* Code § 9–6.14:17. Issues of law specified in the statute "fall into two categories: first, whether the agency ... acted within the scope of [its] authority, and second, whether the decision itself was supported by the evidence." *Johnston–Willis Ltd. v. Kenley,* 6 Va.App. 231, 242, 369 S.E.2d 1, 7 (1988). Although many circumstances involve "mixed questions" of both "law and fact," issues are sometimes "oversimplified" as "legal" or "factual," a distinction that is significant to judicial review of an administrative decision. *Id.* at 243, 369 S.E.2d at 7. The separate standards of review determine the degree of deference, if any, to be given to an agency's decision on appeal. *See id.* at 246, 369 S.E.2d at 9.

> Where the issue is whether there is substantial evidence to support findings of fact, great deference is to be accorded the agency decision. Where the issue falls outside the specialized competence of the agency, such as constitutional and statutory interpretation issues, little deference is required to be accorded the agency decision. Where, however, the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious. *Id.*

*Holtzman Oil Corp. v. Commonwealth,* 32 Va.App. 532, 538–39, 529 S.E.2d 333, 337 (2000).

> Thus, where ... legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, failed to comply with statutory authority, or failed to observe required procedures, less deference is required and the reviewing courts should not

abdicate their judicial function and merely rubber-stamp an agency determination.

*Johnston–Willis*, 6 Va.App. at 243, 369 S.E.2d at 7–8. However, where the "issue is a legal issue which falls within the specialized competence of the Commissioner and his [action] involves the proper application of his expert discretion, we will reverse that decision only if it was arbitrary and capricious." *Id.* at 253–54, 369 S.E.2d at 13. Indeed, "in reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted." *Id.* at 246, 369 S.E.2d at 9.

"The DEQ, acting in conjunction with the Board, is the Virginia agency charged with adminis[tering] the Tank Fund." *Holtzman*, 32 Va.App. at 539, 529 S.E.2d at 337 (citing Code §§ 62.1–44.34:10 through 62.1–44.34:13; Code §§ 10.1–1182 through 10.1–1187); *see also* Code § 62.1–44.34:11. The legislature created the Fund directing that "[d]isbursements from the Fund may be made" for limited purposes, including:

> Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an underground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1–44.34:12, up to one million dollars.

Code § 62.1–44.34:11(A)(2)(a). After disbursing funds for clean-up costs, the statute further authorizes the Board, through the DEQ, to utilize the Fund to pay for:

> Reasonable and necessary per occurrence costs incurred for releases reported after December 22, 1989, by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial

responsibility requirement imposed by subsection B of § 62.1–44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1–44.34:11(A)(2)(b). The Board adopted regulations governing these reimbursement decisions. *See* 9 VA. ADMIN. CODE § 25–590–210.

The present matter, involving the third-party reimbursement provision of Code § 62.1–44.34:11, is one of first impression in Virginia. However, as we held in *Holtzman Oil Corp.*, "[t]he DEQ possesses the requisite experience and competence necessary to determine levels of contamination and the reimbursement due 'owners and operators' for the reasonable costs incurred for their environmental clean-up efforts," pursuant to Code § 62.1–44.34:11(A)(2)(a). *Holtzman*, 32 Va.App. at 539, 529 S.E.2d at 337.

▮ Although Code § 62.1–44.34:11(A)(2)(b) involves a consideration not of the clean-up costs, but of the "reasonable and necessary per occurrence costs incurred . . . by the owner . . . who is the responsible person for compensating third parties, including judgments for bodily injury and property damage caused by the release of petroleum," we find that the DEQ likewise possesses the requisite experience and competence necessary to determine appropriate reimbursement under this section.

Indeed, when the legislature amended the third-party reimbursement language in 1996, it inserted the phrase "reasonable and necessary" before each of the statute's relevant references to "per occurrence costs." *See* 1996 Va. Acts, ch. 737. In so doing, the General Assembly transferred the decision-making power in this regard to the Board and its authorized agent, the DEQ. No evidence before us discloses that it did so without first determining that the Board and its agents were fully competent to render such judgments. *See Groome Transportation, Inc. v. Virginia Department of Motor Vehicles*, 27 Va.App. 682, 696, 500 S.E.2d 852, 859 (1998).

In fact, the entire statute, by its very language, clearly addresses corrective measures, and the costs associated therewith, for remedying releases of petroleum into the environment from underground storage tanks. Thus, although the consideration here involves a determination of reasonable and necessary costs incurred by the responsible party, in compensating a third party, as opposed to clean-up costs, the costs to be considered are clearly set forth by the language of the statute, imposing no need to resort to statutory construction. They are those incurred as a result of compensating a third party for the damage caused by the environmental contamination at issue, an area which we have found falls within the specialized expertise and competence of the DEQ. *See Holtzman*, 32 Va.App. at 539, 529 S.E.2d at 337. As such, its enforcement and implementation of the statutes and regulations governing the Tank Fund's reimbursement policies in this regard, are entitled to deference by a reviewing court and should only be overturned when found to be arbitrary and capricious. *Holtzman*, 32 Va.App. at 538–39, 529 S.E.2d at 337.

Based upon the above, we hold that the trial court properly applied the substantial evidence standard and the arbitrary and capricious standard in reviewing the hearing officer's decision.

B.   Determination of Reasonable and Necessary Costs

7–Eleven next argues that the circuit court failed to properly analyze whether the third-party settlement was reasonable and necessary pursuant to Code § 62.1–44.34:11(A)(2). 7–Eleven contends that the trial court should have considered the settlement amount in light of the pending litigation and the potential judgment and/or jury verdict range to which 7–Eleven was exposed. 7–Eleven further contends that the trial court failed to give proper consideration to the expert opinions offered as they were based upon credible valuation methodologies and would have been admissible in court. We disagree.

As stated above, and in respectful disagreement with the finding in the concurring opinion, the phrase "reasonable and

necessary costs," as it is utilized in Code § 62.1–44.34:11(A)(2), is clear. It provides the DEQ with the *discretion* to reimburse an owner for all "reasonable and necessary" costs incurred as a result of compensating a third party for environmental contamination, except those otherwise excluded by the statute.[7]

The phrase does not confine the DEQ's determination to whether the costs are reasonable in the context of litigation. Thus, because the statute provides the DEQ with the discretion to determine the reasonableness and necessity of all recoverable costs, and does not mandate any specific considerations beyond those parameters, 7–Eleven's argument that the DEQ should have considered factors concerning the reasonableness of the settlement is without merit. Moreover, the dissent's contention that the DEQ was required to consider the reasonableness of the settlement disregards the plain language of the statute.

In addition, contrary to 7–Eleven's argument, neither the circuit court, nor the hearing officer, was required to give weight to the opinions offered by the various experts in this matter. Here, the issue was presented to the hearing officer as a "battle of experts." *See Tidewater Psychiatric Inst. v. City of Virginia Beach,* 256 Va. 136, 141, 501 S.E.2d 761, 764 (1998). As it is the fact finder who " 'weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts,' " appellate courts are not free to reweigh the evidence and set aside a judgment merely because the fact finder could have drawn different inferences or conclusions or

---

7. For example, Code § 62.1–44.34:11(A)(2)(b) limits reimbursement of costs in the form of judgments to those related to "bodily injury and property damage caused by the release." Code § 62.1–44.34:11(A)(5) precludes reimbursement for costs expended for payment of interest or other finance charges on loans used for corrective action or containment, under certain circumstances. Code § 62.1–44.34:11(A)(6) and (7) preclude reimbursement for costs incurred in the form of penalties, charges or fines imposed pursuant to applicable laws, as well as costs that are reimbursed or reimbursable from other applicable state or federal programs.

because parties feel that other results are more reasonable. *Va. and Md. R.R. Co. v. White*, 228 Va. 140, 145, 319 S.E.2d 755, 758 (1984) (quoting *Bly v. Southern Ry. Co.*, 183 Va. 162, 175, 31 S.E.2d 564, 570 (1944)). Indeed, "the very essence of [the fact finder's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." *Id.*

Lastly, we find no merit in 7–Eleven's contention that the hearing officer and the circuit court disregarded the temporary damage issue. The hearing officer specifically considered whether 7–Eleven was entitled to temporary damages in this case, and determined that the injuries suffered were permanent in nature as there was no evidence suggesting that the contamination would ever be completely abated, or at least within what time frame complete abatement was likely to occur.

Accordingly, because there is substantial credible evidence supporting the hearing officer's determinations, and because there is no indication in the record that the hearing officer's determinations on these issues were arbitrary and capricious, we find no error in the trial court's decision to uphold the hearing officer's judgment.

### C. Application of Guidelines

■ Finally, 7–Eleven maintains that the Fund's Guidelines, which were promulgated by the DEQ and became effective on February 12, 1998, conflict with Code § 62.1–44.34:11(A)(2)(b) by unlawfully restricting the damages subject to reimbursement. Specifically, 7–Eleven contends that the Guidelines fail "to recognize that under Virginia's law on tort damages" a responsible party should be "entitled to recover, if proven, all of the proximately caused damages specified in [the third-party plaintiff's] motion for judgment," as reasonable and necessary costs. 7–Eleven argues the Guidelines produce "artificial limits," inconsistent with a claimant's "real exposure to liability, which is what this court should presume the legislature intended." Once again, we disagree.

The plain language of Code § 62.1–44.34:11(A)(2)(b) clearly states that the Board is to reimburse for costs determined to be "reasonable and necessary" and that such costs include judgments for bodily injury and property damage. The Guidelines designate as eligible for reimbursement valid costs incurred by the responsible party in compensating the third party for bodily injury, damage to real property, including temporary damages and permanent damages, as well as personal property damage and lost net profits. Further, § VIII of the Fund Guidelines states:

> The Agency's acquiescence to a settlement between owner and third party does not mean that the Agency will pay the full settlement amount. Settlements and final court orders will be used as baselines from which the Agency will conduct eligibility, reasonableness, and necessity reviews.

Virginia Petroleum Storage Tank Fund Third Party Disbursements Guidelines, § VIII.

The fact that the Guidelines do not designate as eligible any and all costs incurred does not conflict with the charge given to the Board and its agents by the legislature. In fact, as stated above, the statute does not entitle a claimant to a recovery for any and all costs incurred in the form of damages. Instead, the legislature limited reimbursable costs to those that the Board, in its discretion, finds reasonable and necessary, "including payments of judgments for bodily injury and property damage." Code § 62.1–44.34:11(A)(2)(b). The legislature did not provide for reimbursement of litigation costs and/or the various damages that might be reflected in the form of a settlement. We reiterate that litigation and related settlements can often reflect inflated and/or unnecessary costs, and even speculative damages based on the parties' theories of what a judge or jury *might* award.

"Where a statute is unambiguous, the plain meaning is to be accepted without resort to the rules of statutory interpretation." *Last v. Virginia State Bd. of Med.*, 14 Va.App. 906, 910, 421 S.E.2d 201, 205 (1992). " 'Courts are not permitted to rewrite statutes. This is a legislative function. The manifest

intention of the legislature, clearly disclosed by its language, must be applied.' " *Barr v. Town & Country Properties, Inc.,* 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting *Anderson v. Commonwealth,* 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944)). Therefore, we cannot broaden the parameters of the statute at issue as 7–Eleven suggests. To do so would conflict with the legislature's clear intention to limit the reimbursement available and to provide the Board with discretion in determining reasonable and necessary costs.

For the foregoing reasons, we affirm the decision of the trial court, upholding the award of the Department of Environmental Quality.

*Affirmed.*

ANNUNZIATA, Judge, concurring.

Although I concur in the holding of the majority opinion, I do so based on different analytical considerations, beginning with my finding the term, "costs," as it is used in Code § 62.1–44.34:11(A)(2)(a)–(b), to be ambiguous.

Code § 62.1–44.34:11(A)(2)(a) provides reimbursement by the state for:

a. Reasonable and necessary per occurrence costs incurred for releases reported ... by the owner or operator who is the responsible person, in taking corrective action for release of petroleum into the environment.

Code § 62.1–44.34:11(A)(2)(b) states that "costs" includes "payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank." The term "costs" is not more specifically defined under the Tank Fund statute and neither Code section makes clear whether the legislature intended to limit recovery to actual clean-up costs for the property in question or whether the term "costs" encompasses other factors, such as the costs of prosecuting a suit for such damages, settlement costs incurred in conjunction with such a suit, or damages as defined in the context of litigation.[8]

---

**8.** "The term 'costs' also has a well-defined legal meaning: Those expenses incurred by parties in prosecuting or defending a suit, action

No reference to settlement costs, whatsoever, is made in the statute. The sole reference to "settlement" is found in § VIII of the Fund Guidelines, promulgated by the DEQ in 1998. The reference is general in its import and, like the statute, is devoid of any definition of the components to be considered.[9]

In short, I find the term "costs," as employed in § 62.1–44.34:11(A)(2), as well as in the Guidelines that the DEQ promulgated, to be ambiguous and subject to statutory construction. The ambiguity gives rise to dual inquiries: Did the legislature intend compensation to extend to amounts expended in settling litigation and, if so, what factors relating to settlement are to be considered?[10]

---

or other proceeding at law or in equity, recognized and allowed by law, and taxed against the losing party." *Morgan v. Haley,* 107 Va. 331, 337, 58 S.E. 564, 566 (1907). The Code sections in the matter at issue cannot necessarily be read as incorporating the traditional legal definition of the term.

9. The Guidelines specifically provide:
The Agency's acquiescence to a settlement between owner and third party does not mean that the Agency will pay the full settlement amount. . . .
A. Settlements
1. Owners/operators and third parties contemplating settlement should obtain DEQ advance determination of the amount of damages identified in the settlement total, which will be eligible for disbursement.
2. DEQ will attempt to review the proposed settlement within ninety days from receipt of a completed third party claim.
3. For settlements, the owner/operator must demonstrate the basis of [his] liability to the third party and that the liability, if not certain, is at least fairly disputable. DEQ reserves the right to review all settlements for reasonableness.
Virginia Petroleum Storage Tank Fund Third Party Disbursements Guidelines, § VIII.

10. Among the criteria one might use in assessing the reasonableness of settlement in the context of litigation
include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recom-

The principles of law that govern statutory construction are well settled. *See, e.g., Grillo v. Montebello Condominium Owners' Ass'n*, 243 Va. 475, 416 S.E.2d 444 (1992); *Shackelford v. Shackelford*, 181 Va. 869, 27 S.E.2d 354 (1943); *Watkins v. Hall*, 161 Va. 924, 172 S.E. 445 (1934). The most relevant to our inquiry requires the trial court to give deference to an Agency's interpretation of the legislation. As noted in *Southern Spring Bed Co. v. State Corp. Comm'n*, 205 Va. 272, 275, 136 S.E.2d 900, 902 (1964), "the construction given to a statute by public officials charged with its enforcement is entitled to great weight ... and in doubtful cases will be regarded as decisive."

In its analysis, the Agency noted that it could not find any authority for 7–Eleven's proposition that factors such as the strength of the case, the potential range of jury verdicts, the likely duration of the litigation and other similar "cost of settlement" factors, were to be considered by the Agency in awarding compensation under the statute, and 7–Eleven cites none. Rather, it simply contends that, since the reimbursement statute specifically includes "judgment" as part of what might be reasonable and necessary, the legislature contemplated that litigation between owners, operators and aggrieved third parties would be instituted and that at least some of the litigation would result in settlement. From that premise, 7–Eleven concludes that the legislature intended "the traditional common law factors that are used by courts to determine the reasonableness and necessity of a settlement [such as the expense, complexity and likely duration of the litigation] to apply when the DEQ ma[kes] its initial judgement, as well as when an appellate court review[s] that decision." It cites no authority for that proposition, nor explains why its proposed reasoning and conclusion necessarily follow, particularly in the context of the statute at issue here.

---

mendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement.
*Dauphin Deposit Bank & Trust Co. v. Hess*, 556 Pa. 190, 727 A.2d 1076, 1078 (1999).

In this case, the Agency employed the settlement as its point of departure, as provided in the Guidelines, and determined that the amount expended in settlement was compensable, but found the statute and case law limited its consideration to the costs incurred as a result of the property damage caused by the spill, using as its measure the diminution in the market value of the property.[11] *See Packett v. Herbert,* 237 Va. 422, 427, 377 S.E.2d 438, 442 (1989). An appellate court is required to give deference to the Agency's interpretation of the statute and, "in doubtful cases [that interpretation] will be regarded as decisive." *Southern Spring,* 205 Va. at 275, 136 S.E.2d at 902. I find the trial court properly applied this rule of law. 7–Eleven also contends it is entitled to damages for "carrying costs, lost profits and lost investment income." There is no legal authority to support the proposition that such elements of damage are compensable under the statute. Code § 62.1–44.34:11(A)(2)(b) defines reimbursable "costs" only as: "payment of judgments for ... property damage caused by the release of petroleum into the environment from an underground storage tank." Furthermore, the Agency's Guidelines exclude from reimbursement "intangible property damage costs." Guidelines, § VIII. The Guidelines, thus, focus on damage to the property itself.

The Agency's interpretation of the statute is buttressed by the legislature's adoption of a provision defining what a third party may claim in damages as a result of a prohibited discharge. Whenever possible, we interpret separate sections of a statute as a consistent and harmonious whole so as to effectuate the legislative goal. *See Virginia Elec. & Power Co. v. Bd. of County Supervisors,* 226 Va. 382, 388, 309 S.E.2d 308, 311 (1983). Code § 62.1–44.34:18(C)(4) sets forth the

---

11. In addition to its statutory analysis, the DEQ noted numerous factual problems with 7–Eleven's claim, including 7–Eleven's failure to provide the Agency with the legal theories underlying the damages it sought in the litigation and upon which settlement was premised. The Agency thus had no way to evaluate whether 7–Eleven's claims for damages other than those damages related to property damage were legally viable.

damages which an injured third party may recover for property damage in a suit against a liable owner/operator, and specifically contemplates recovery for "loss of income, loss of the means · of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural or other reasonable uses, caused by such discharge." The statutory provision at issue in 7–Eleven's claim is distinguished by the absence of such language; reimbursement is explicitly limited to costs for "property damage," with no mention of lost income or profits. When interpreting statutory language, we must assume that the legislature chose with care the words it used and, where it includes specific language in one section but omits that language from another section, we presume that the exclusion of the language was intentional. *See Industrial Dev. Auth. v. Bd. of Supervisors,* 263 Va. 349, 353, 559 S.E.2d 621, 623 (2002).

Under the familiar principle of law governing appellate review of an Agency's construction of a statute that it is mandated to enforce, the trial court properly gave the Agency's interpretation great deference on appeal. In the absence of specific statutory language to the contrary, or clearly supportive case precedent, I find the trial court did not err in according the Agency's interpretation of the statute such deference.[12] *See Holtzman Oil Corp. v. Commonwealth,* 32 Va.App. 532, 538–39, 529 S.E.2d 333, 337 (2000).

Having determined the Agency properly limited its consideration of settlement "costs" to those related to permanent real property damage, the trial court concluded that the Agency used the correct measure of damages and found that substantial evidence supported its calculation. The evidence in the record supports the trial court's determination. Specifi-

---

12. I further note that, even were 7–Eleven's position to be adopted, no evidence relating to the *Dauphin* factors relevant to assessing the reasonableness of a settlement, such as the complexity of the case, the range of jury verdicts and other such facts that 7–Eleven asked be considered, was submitted and there has been no showing that the Agency has the expertise necessary to determine the reasonableness of settlement, absent such evidence.

cally, the record discloses that the Agency began its review of the settlement amount,[13] excluding all but the amount relating to the diminution of market value. Then, applying traditional principles governing the evaluation of evidence both expert and lay, together with its expertise, the Agency determined that the amount 7–Eleven sought was not reasonable and necessary, and set its award at $103,117. That determination, which was based on the application of its expert discretion, fell within the specialized competence of the Agency. The trial court may not substitute its own independent judgment for that of the Agency and will only reverse the Agency decision if it was arbitrary and capricious. *See Holtzman*, 32 Va.App. at 538–39, 529 S.E.2d at 337. Because I find the trial court's deference to the Agency's construction of the statute was proper and that it also properly found that substantial evidence supported the Agency's findings of fact, I would affirm its decision to sustain the Agency's decision.

BENTON, J., dissenting.

## I.

The Department of Environmental Quality, which the legislature created to consolidate the programs of the State Water Control Board and four other agencies, *see* Code § 10.1–1182 *et seq.*, administers the Petroleum Storage Tank Fund for the Board. *See* Code §§ 62.1–44.34:10 through 62.1–44.34:13. In pertinent part, the Tank Fund statute provides as follows:

2. Disbursements from the Fund may be made only for the following purposes:

a. Reasonable and necessary per occurrence costs incurred for releases ... by the owner or operator who is the responsible person, in taking corrective action for any release of petroleum into the environment from an under-

---

**13.** The Agency Guidelines provide: "Settlements and final court orders will be used as *baselines* from which the Agency will conduct eligibility, reasonableness, and necessity reviews." Guidelines, § VIII (emphasis added).

ground storage tank which are in excess of the per occurrence financial responsibility requirement imposed in subsection B of § 62.1–44.34:12, up to one million dollars. b. Reasonable and necessary per occurrence costs incurred for releases ... by the owner or operator who is the responsible person for compensating third parties, including payment of judgments for bodily injury and property damage caused by the release of petroleum into the environment from an underground storage tank, which are in excess of the per occurrence financial responsibility requirement imposed by subsection B of § 62.1–44.34:12, up to one million dollars. Disbursements for third party claims shall be subordinate to disbursements for the corrective action costs in subdivision A 2 a of this section.

Code § 62.1–44.34:11(A)(2).

The evidence in the record proved that in June 1990, 7–Eleven reported to the Board a leaking gasoline pump at one of its properties in Henrico County. After an environmental consultant hired by 7–Eleven found petroleum in the ground and in a spring and stream, 7–Eleven hired a contractor to clean the affected areas, including contamination on a nearby parcel of property owned by Hechinger, Inc. The corrective action, however, only partially abated the petroleum plume in the groundwater. As permitted by the Tank Fund, 7–Eleven requested reimbursement from the Board for its "reasonable and necessary ... costs" in correcting the release of petroleum into the environment. *See* Code § 62.1–44.34:11(A)(2)(a). The Board, acting through the Department, reimbursed 7–Eleven for $408,838.74 of its costs. Those costs and reimbursements are not at issue in this appeal.

In April 1995, Hechinger sued 7–Eleven in the Circuit Court of the City of Alexandria for property damage caused by the petroleum release, alleging negligence, trespass, nuisance, and statutory liability under Code § 62.1–44.34:18(C)(4). The motion for judgment sought damages of $2,000,000, interest, costs, and attorneys' fees. While the litigation was pending, 7–Eleven notified the Department of its potential claim

against the Tank Fund for damages to Hechinger's property. *See* Code § 62.1–44.34:11(A)(2)(b). After 7–Eleven stipulated to statutory liability under Code § 62.1–44.34:18(C)(4), the case went to trial in the circuit court on the issue of damages. During the second day of trial, the parties agreed that 7–Eleven would pay Hechinger $575,000 as a settlement of its $2,000,000 claim.

7–Eleven notified the Department of the settlement and sought reimbursement for the settlement amount from the Tank Fund. In support of its claim, 7–Eleven presented to the Department various documents, including exhibits prepared for and used at trial. The Department held an informal fact-finding proceeding and allowed 7–Eleven to later submit additional evidence. Based on its consideration of the evidence, the Department awarded 7–Eleven $103,117 as reimbursement for payment of property damage to Hechinger. *See* Code § 62.1–44.34:11(A)(2)(b). The Department found that this amount represented the diminution in the market value of Hechinger's property.

7–Eleven appealed to the circuit court, alleging the case decision was unlawful. Following written briefs and oral argument, the trial judge ruled that the Department's decision concerning "reasonable and necessary per occurrence costs" for compensating Hechinger for property damage was an issue involving the Department's special expertise. Finding that the decision was supported by substantial evidence and was not arbitrary and capricious, the trial judge upheld the Department's decision to award only partial reimbursement to 7–Eleven.

## II.

In simple terms, the issue in this appeal is whether, in evaluating the "reasonable and necessary . . . costs" 7–Eleven incurred in compensating Hechinger for property damage caused by the petroleum release, the Department could fail to consider the reasonableness of the $575,000 settlement. Noting that its liability was indisputable, 7–Eleven contends the

Department erred by failing to consider the factors reflective of the reasonableness of the settlement for damage to Hechinger's property, including "the strength of Hechinger's case heading into trial, 7–Eleven's exposure to liability and damages, the expense to the parties, the complexity of the issues presented in the litigation, the likely duration of the litigation, the amount offered at settlement, and the state of the proceedings at the time of the settlement." The Department responds that the trial judge correctly ruled that substantial evidence supported the Department's decision.

### A.

At the outset, I would note that the Assistant Attorney General conceded at oral argument that, if the litigation had gone to judgment in Hechinger's favor, the judgment amount would have established 7–Eleven's reasonable and necessary costs for purposes of Code § 62.1–44.34:11(A)(2)(b), subject only to the statutory limitation. Thus, he agreed that, if the case had gone to judgment for an amount in excess of $1,000,000, the Department would have no basis to challenge the reasonableness of the judgment amount as a necessary cost 7–Eleven incurred for the petroleum spill. A plain reading of the statute permits no other conclusion. Significantly, the Assistant Attorney General further conceded he would be "hard pressed to challenge the reasonableness of [the] settlement" 7–Eleven made in this case. Indeed, the record reflects that neither the Department nor the trial judge found that the settlement was unreasonable or unnecessary given the circumstances of the litigation. Moreover, the Department found that "[a]t a minimum, information contained in the Department's corrective action files demonstrates that the contamination ... originated from the [7–Eleven] release" and, thus, determined 7–Eleven's liability was "fairly disputable."

To the extent the Department concluded, without determining the reasonableness of the settlement, that 7–Eleven's settlement costs were not recoverable, the Department's decision was based on an interpretation of Code § 62.1–44.34:11(A)(2)(b) that excluded from the Code's definition of

"costs" the kind of property damage settlement costs 7–Eleven incurred. Dismissing 7–Eleven's claims on its appeal to the circuit court, the trial judge ruled that "[b]ecause the statute does not tie the reasonableness requirement to the litigation arena, the Department did not need to consider the factors listed by [7–Eleven] and failure to do so was not error."

I believe those decisions are legally flawed and should be reversed.

### B.

In reviewing those decisions, I would hold that no special agency expertise is necessary for a resolution of this issue.

The sole issue involves a question of statutory interpretation. The issue does not involve "the substantiality of the evidential support for findings of fact," which requires great deference because of the specialized competence of the agency. Instead, when, as here, the question involves a statutory interpretation issue, "little deference is required to be accorded the agency decision" because the issue falls outside the agency's specialized competence. *Sims Wholesale Co. v. Brown–Forman Corp.*, 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (citation omitted). "The reviewing court may set the agency action aside, even if it is supported by substantial evidence, if the court's review discloses that the agency failed to comply with a substantive statutory directive." *Browning–Ferris Indus. of South Atlantic, Inc. v. Residents Involved in Saving the Env't, Inc.*, 254 Va. 278, 284, 492 S.E.2d 431, 434 (1997).

### C.

The principle is well established that "[w]ords in a statute are to be construed according to their ordinary meaning, given the context in which they are used." *Grant v. Commonwealth*, 223 Va. 680, 684, 292 S.E.2d 348, 350 (1982); *Loyola Fed. Savings and Loan Ass'n v. Herndon Lumber & Millwork, Inc.*, 218 Va. 803, 805, 241 S.E.2d 752, 753 (1978). The

clear wording of Code § 65.1–44.34:11(A)(2)(b) provides that an owner may recover "[r]easonable and necessary ... costs incurred for releases [of petroleum from an underground storage tank] ..., including payment of judgments for bodily injury and property damage." In the context of the statute, the word "costs" means "an item of outlay incurred in the operation of a business enterprise." *Webster's Third New International Dictionary* 515 (1981), or as more generally understood, "the expenditure or outlay of money." *Id.*

Except as generally circumscribed by the Tank Fund scheme, Code § 65.1–44.34:11(A)(2)(b) does not contain an exclusive listing of costs to be reimbursed and clearly does not exclude money paid in a settlement for property damage as a factor to be used in determining the "[r]easonable and necessary ... costs" of an owner. Moreover, the statutory directive to consider "payment of judgments for ... property damage caused by the release of petroleum" as a measure of the "[r]easonable and necessary per occurrence costs" clearly encompasses settlements that occur during litigation concerning the property damage. Because the statute is without limitation in defining the type of costs recoverable by an owner who has compensated a third party for damage caused by a petroleum release from an underground tank, a plain reading of the statute manifests an intention that settlement expenses are "costs" contemplated by the legislature.

By specifically denoting that "[r]easonable and necessary ... costs" would "includ[e] payment of judgments for ... property damages," the legislature obviously contemplated that litigation might occur and that any resulting judgment would be included in the determination of costs to be reimbursed from the Tank Fund.Code § 62.1–44.34:11(A)(2)(b). In addition, however, the statutory term "costs," is inclusive of the expenditures an owner makes to third parties for property damage and does not pertain exclusively to judgments as the Department suggests. The clear and ordinary language of the statute manifests that "[b]y the use of the term 'including,' [the legislature] indicated that the specifically mentioned [payments] are not exclusive." *Herb's Welding, Inc. v. Gray,* 470

U.S. 414, 423 n. 9, 105 S.Ct. 1421, 1427 n. 9, 84 L.Ed.2d 406 (1985). I would hold that the wording of the statute leaves no doubt that the legislature envisioned legal actions being brought against owners for petroleum spills and that the legislature intended that the monetary result of those legal actions for property damage, including settlements, be included as a costs to be reimbursed.

Furthermore, our reading of the statute must be governed by the following principles:

> Every statute is to be read so as to "promote the ability of the enactment to remedy the mischief at which it is directed." *Natrella v. Board of Zoning Appeals*, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting *Jones v. Conwell*, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)). The ultimate purpose of all rules of construction is to ascertain the intention of the legislature, which, absent constitutional infirmity, must always prevail. All rules are subservient to that intent. *Shackelford v. Shackelford*, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943). Further, it is a universal rule that statutes ..., which are remedial in nature, are to be "construed liberally, so as to *suppress the mischief* and advance the remedy," as the legislature intended. *Shumate v. Com.*, 56 Va. (15 Gratt.) 653, 661 (1860) (emphasis added).

*Board of Sup. v. King Land Corp.*, 238 Va. 97, 103, 380 S.E.2d 895, 897–98 (1989).

The Tank Fund is a part of a broader scheme of the State Water Control Law adopted to protect the quality of state waters and to prevent any increase in pollution. Code § 62.1–44.2. "Monies held in the Tank Fund originate from expenses and penalties recovered pursuant to various provisions of state and federal law, fees levied on fuel sold, delivered and used in the Commonwealth, and interest earned on monies in the Fund." *May Dep't Stores Co. v. Commonwealth of Va., Dep't of Environmental Quality*, 29 Va.App. 589, 598, 513 S.E.2d 880, 884 (1999) (citing Code §§ 62.1–44.34:11, 62.1–44.34:13). The Tank Fund was designed to provide for a prompt, efficient means of abating pollution caused by underground stor-

age tanks and to facilitate payment of compensation to third parties who have suffered bodily injury and property damage caused by release of petroleum from underground storage tanks. The statute renders irrelevant whether the third party has been compensated for those injuries by a judgment or by a reasonable settlement prior to judgment.

In determining the costs to be reimbursed, the Department can only fulfill its responsibility under the statute—to ensure that the public interest is served—if it considers the reasonableness of the cost of settling litigation. This conclusion is buttressed by long-standing "settled principles of law," which the Supreme Court has recognized as a matter of public policy and equity, that " '[t]he law favors compromise and settlement of disputed claims.' " *Snyder–Falkinham v. Stockburger,* 249 Va. 376, 381, 457 S.E.2d 36, 39 (1995) (citation omitted); *see also Eggleston v. Crump,* 150 Va. 414, 418–19, 143 S.E. 688, 689 (1928). Indeed, here, where the issue of liability is uncontested, it would be contrary to the clear meaning of the statute and, furthermore, would be incongruous and injurious to public policy to hold that the Department could fail to consider the settlement costs as a factor in determining reasonable and necessary costs for property damage caused by 7–Eleven's petroleum spill.

The Department's interpretation leads to a costly and irrational result. Because the Department's decision creates uncertainty in what is reimbursable, owners who caused spills would be forced to reject most reasonable settlements in favor of adjudication. Owners would refuse to settle whenever the difference between the proposed settlement and what they estimate the Department is willing to pay is greater than the difference between the potential judgment and the fund's maximum pay-out limit. For example, in this case, after paying the clean up costs, because the Tank Fund has a pay-out cap of one million dollars, $585,937 is available for third-party claims. Minus the $150,000 deductible, the Tank Fund is liable up to $435,937. At this point, the owner faces a tough decision. Assuming, as in this case, the Department assesses the damage to the third party at an amount less then the

deductible, the owner can either pay the full value of the settlement out of its own pocket, or it can adjudicate. If the owner chooses to adjudicate, because the Department must consider court judgments as reasonable "costs," as long as the judgment does not exceed $435,937 above the value of the proposed settlement, the owner's out of pocket exposure will be less. In this case, that means as long as the amount of the judgment is estimated to be less than $1,010,037, 7–Eleven should adjudicate. Assuming judgments are generally higher than settlements, the Department will pay more out of the Tank Fund because owners have great incentive to adjudicate.

The Department does not offer and I do not discern any logical reason why the legislature would have intended to differentiate between reimbursement for settlements and reimbursement for judgments. If we read the statute, as we must, to promote its ability to "remedy the mischief at which it is directed," *King Land Corp.*, 238 Va. at 103, 380 S.E.2d at 897, the statute inexorably and logically manifests the conclusion that settlements of legal actions would occur, that settlements would be judged by determining the reasonableness of the settlement, and that the amount of a reasonable settlement would also be an item the Department would reimburse as "reasonable and necessary . . . costs." Thus, I would hold that the Department's interpretation of the statute to preclude recovery of settlement costs is contrary to a plain reading of the statute which requires, subject only to the statutory limitation of one million dollars, that costs an owner incurs for compensating third parties for property damage caused by petroleum releases be reimbursed based on whether they are reasonable and necessary.

### D.

Significantly, the Department now recognizes in the preamble to its Guidelines, which were adopted on February 12, 1998, after 7–Eleven settled the litigation, that "disbursements . . . may be made for costs incurred . . . to compensate third parties for the *reasonable and necessary costs of settlements* and judgments for . . . property damage." Virginia Petroleum

Storage Fund Third Party Disbursement Guidelines (emphasis added). To implement that policy, the Guidelines now provide that the Department will *"review all settlements for reasonableness."* Guidelines, VIII(A)(3) (emphasis added). This policy, which the Department apparently derives from the authority of the statutes is precisely the remedy 7–Eleven contends is mandated by the statutes and pre-existed the adoption of the Guidelines.

Neither the Department in its fact finding nor the trial judge on review determined that $575,000 was an unreasonable amount to settle the pending property damage litigation or that $575,000 was not within the range of a judgment of a rational jury had the litigation, which already had consumed a day and one-half at trial, proceeded to judgment on the merits. *See Dauphin Deposit Bank and Trust Co. v. Hess,* 556 Pa. 190, 727 A.2d 1076, 1078 (Pa.1999) (holding that criteria used in assessing the reasonableness of settlement "include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the [beneficiaries] to the settlement"). Likewise, the record contains no finding that a $575,000 judgment by a jury for the property damage would have been so excessive as to require a trial judge to set it aside or as to require an appellate court to do the same. *See Edmiston v. Kupsenel,* 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964). The majority opinion's suggestion that, prior to the adoption of the Guidelines, the Department had the discretion to refuse to consider the settlement as a "costs" is simply based on a misreading of the Tank Fund statutes.

### E.

Without assessing any of the issues concerning the likelihood of success at trial or the reasonableness of the settle-

ment, the Department made its own judgment that the lowest values were more credible and found as follows:

Based on the valuation information provided, a reasonable range for the permanent damages was between $138,700 and $103,117 (i.e., $938,700 or $903,117 minus $800,000). It is not necessary to make an adjustment to reflect partial cure costs, because the $800,000 offer [to purchase the property] appeared to be from an arms-length buyer and was made at a time when the cure of the property was nearly complete. Additionally, the evidence does not clearly demonstrate that topographical problems at the site affected the offer price. Therefore, [7–Eleven] will be given the benefit of the doubt on this issue, and no adjustment will be required to address this alleged cause of reduced property value. For the foregoing reasons, third party claim costs in the amount of $103,117 are approved, as this amount reflects actual market values.

This record clearly "demonstrate[s] an error of law ... [concerning] compliance with statutory authority." Code § 9–6.14:17. In short, the Department did not evaluate the reasonableness and necessity of the settlement but, instead, reviewed the evidence developed during the litigation and decided, independent of the litigation risk, an amount it believed represented the diminution of the fair market value of the property. The Department then ruled that this amount constituted the reasonable and necessary costs to be reimbursed.

Put simply, the Department's decision was contrary to the plain language of the statute. "Since the issue before us is purely one of law, containing no underlying factual issues, we do not apply a presumption of official regularity or take account of the experience and specialized competence of the administrative agency." *Browning–Ferris Indus.*, 254 Va. at 284, 492 S.E.2d at 434. A reviewing court may reverse an agency's determination where the agency's decision is based on an improper statutory interpretation. *Johnston–Willis, Ltd. v. Kenley*, 6 Va.App. 231, 247, 369 S.E.2d 1, 10 (1988).

Code § 9–6.14:19, a part of the Administrative Process Act, controls the action a . . . court may take when it finds a case decision "to be not in accordance with law under § 9–6.14:17." Among the errors of law addressed in the latter statute is failure of the agency to comply "with statutory authority" and failure of the agency to observe "required procedure." § 9–6.14:17(ii) and (iii). When the court finds the case decision to be unlawful on these grounds, it "shall suspend or set it aside and remand the matter to the agency for such further proceedings, if any, as the court may permit or direct in accordance with law." § 9–6.14:19.

*Virginia Bd. of Med. v. Fetta,* 244 Va. 276, 280, 421 S.E.2d 410, 412 (1992).

For these reasons, I would hold that because Code § 62.1–44.34:11(A)(2)(b) requires the Department, in administering the Tank Fund, to assess the "reasonable and necessary . . . costs incurred for releases . . . by the owner . . . for compensating third parties, including payments of judgments for . . . property damage caused by the release," the Department erred when it failed to assess the reasonableness of the settlement and failed to determine as a factor in reimbursing 7–Eleven for its reasonable and necessary costs the settlement amount paid by 7–Eleven to Hechinger.

### III.

7–Eleven additionally contends the Department's Guidelines impermissibly restrict recovery of property damage. The Department responds that the question of which costs are eligible for reimbursement is an issue of fact and that 7–Eleven's evidence failed to prove other costs were attributable to the spill. Alternatively, the Department contends that 7–Eleven's other costs were "intangible property damage costs and interest" which the Department properly excludes from the Guidelines. Assessing these arguments, the trial judge ruled that "[t]he Department [was within] . . . its discretion [in concluding] that those costs associated with permanent damages to property which are both reasonable and necessary are

either the diminution in value of the property or the cost to restore the property."

## A.

The Guidelines provide in pertinent part as follows:

Costs incurred by owners/operators, in compensating third parties for real property damage proximately caused by a release from an owner's/operator's eligible tank, which are eligible for disbursement from the Fund include the following:

1.  For temporary damage to real property, the decrease in rental value during the continuance of the injury, and

2.  For permanent damage to real property, the lower of (I) the diminution in the value of the real property and fixtures (as determined after completion of corrective action) or (ii) the cost to restore the real property to its condition prior to the injury.

Guidelines VI(C).

In granting the Department the discretion to determine whether costs an owner incurred "for compensating third parties ... for property damage caused by the release of petroleum" were reasonable and necessary, Code § 62.1–44.34:11(A)(2)(b), the General Assembly obviously intended that the Department determine, on a case-by-case basis, which costs would be reimbursed. In other instances, where a statute has given an agency such discretion, we have reversed agency action, noting that, "[a]lthough the statute authorizes the use of discretion, the current policy guidelines allow no discretion to be exercised in determining [the statutorily delegated function]." *Woods v. Commonwealth,* 26 Va.App. 450, 458–59, 495 S.E.2d 505, 509 (1998).

By restricting recovery of property damages to only those specifically listed in the Guidelines, the Department concluded as a matter of law that other costs would not be reimbursed. The trial judge ruled that the Department's interpretation of permissible damages for permanent injury to real property

was "implemented through the Guidelines ... [and was not] arbitrary and capricious." I would hold that the trial judge erred in applying this standard.

## B.

Limiting permanent damages to the diminution in the value of the property, the Department ruled as follows:

Upon site closure, contamination remained on the Hechinger property. The Regional Office's July 7, 2000 memorandum indicates that it is simply not possible to predict how long it will take for natural attention [sic] to return the site to background levels. [7–Eleven] provided no evidence and no evidence exists in the Agency's records that indicates the remaining contamination will attenuate within a known time frame. Consequently, it is appropriate to treat the injury as permanent. The measure for permanent injury to real property pursuant to *Packett v. Herbert* is the permanent diminution in the value of the property.

To determine the permanent diminution in the value of the property, the fair market value of the property after the injury is subtracted from the fair market value of the property before the injury.

The Department improperly relied on *Packett v. Herbert,* 237 Va. 422, 377 S.E.2d 438 (1989), to conclude that permanent damages are limited to the diminution in the value of the property.

It is well settled that a party may recover for all damages proximately caused by another party's tortious conduct. *Lochaven Co. v. Master Pools by Schertle, Inc.,* 233 Va. 537, 541, 357 S.E.2d 534, 537 (1987). The Supreme Court held in *Lochaven Co.* that "[t]he measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct." 233 Va. at 541, 357 S.E.2d at 537. Indeed, the Court has held that a jury may properly "assess damages for defendant's conduct in diminishing the value of plaintiffs' properties, for continuously interfering with the enjoyment of

that property, and for causing material disturbance or annoyance to plaintiffs in their use and occupation of the property." *National Energy Corp. v. O'Quinn*, 223 Va. 83, 91, 286 S.E.2d 181, 186 (1982).

Where, as 7–Eleven contends in this case, Hechinger sued for and was entitled to carrying costs, lost profits, and lost investment income proximately caused by 7–Eleven's conduct, such costs are recoverable under Virginia tort law if proved. *Id. See also Raleigh Court Corp. v. Faucett*, 140 Va. 126, 142, 124 S.E. 433, 437–38 (1924) (permitting recovery for "temporary and permanent damage . . . done to the plaintiff's lot [of land]"). Indeed, Code § 62.1–44.34:18(C)(4), which addresses an owner's liability for the petroleum spill, recognizes potential liability for "damage to . . . property, . . . loss of income, loss of the means of producing income, or loss of the use of the damaged property for . . . commercial, industrial, . . . or other reasonable uses, caused by such discharges." The record contains the expert appraisals on the pre-injury and post-injury value of Hechinger's property. The record also contains the opinion of Salzman Real Estate Services, Inc., an expert hired by Hechinger, that Hechinger incurred as a result of the spill lost rental income of $710,000 and lost investment returns of $550,000. Salzman calculated that Hechinger had also incurred and paid as property expenses resulting from the spill $283,000 in additional insurance, taxes, administrative expenses, legal fees, and expert fees.

The Department did not consider whether the expenses Hechinger claimed in the litigation represented the damage caused by the petroleum spill. Once the Department summarily concluded that it was appropriate to treat the damages in the present case as permanent because no evidence proved that the damage to the property "[would] attenuate within a known time frame," the Department declined to address whether damages, other than the diminution in the value of the property, were also appropriate. Indeed, the Department's decision states that proof of lost investment income, lost rental income, and carrying costs were not considered

because they did not conform to the damage formula prescribed in *Packett.*

In *Packett,* upon which the Department relied in limiting its award to only diminution in value of the property, the Supreme Court did not preclude recovery of other damages. *See* 237 Va. at 426–27, 377 S.E.2d at 442. The Court simply held that it would be improper to allow both an injunction and permanent damages because both remedied future harm, i.e., while permanent damages compensate for the future harm, an injunction eliminates future harm. *Id.* In so ruling, the Court noted that in *Miller v. Trueheart and Others,* 31 Va. 569, (4 Leigh) 569 (1833), a party properly was entitled to temporary damages and later an injunction. *Packett,* 237 Va. at 427, 377 S.E.2d at 442. Such damages do not constitute an improper double compensation to the injured party because the temporary damages compensate for past harm while the injunction remedies future harm. *See Faucett,* 140 Va. at 142–43, 124 S.E. at 437–38 (holding that a party was entitled to receive both temporary and permanent damages for property injury).

## C.

Without permitting double recovery, the Department should have analyzed whether any of the other expenses alleged by Hechinger were proximately caused by the petroleum spill and were properly encompassed by the settlement. I would hold that because the Department determined without factual analysis that 7–Eleven was not allowed to recover as costs other items that Hechinger alleged as expenses resulting from the property damage, the Department erred as a matter of law in its assessment of the extent of 7–Eleven's liability to Hechinger for property damage.

## IV.

For these reasons, I would reverse the judgment and remand for reconsideration with instructions to analyze the reasonableness of the settlement, giving due consideration to

the property damages for which 7–Eleven was liable to Hechinger. Therefore, I dissent.